Sardul S. PANNU and Surinderjit G. Pannu, Appellants,

v.

Jeff JACOBSON, M.D., Neurological Surgery Group, and Washington Brain and Spine Institute, P.C., Appellees.

No. 04–CV–303.

District of Columbia Court of Appeals.

Argued Sept. 27, 2005.

Decided Oct. 19, 2006.

Marc Fiedler, Washington, DC, for appellants.

Brian J. Nash, Towson, MD, with whom Leonard W. Dooren, was on the brief, for appellees.

Before REID and KRAMER, Associate Judges, and NEWMAN, Senior Judge.

REID, Associate Judge:

After a jury trial in this medical malpractice matter, which involved lower back surgery and allegations of improper surgical technique, the jury rendered a verdict in favor of appellees, Dr. Jeff Jacobson, the Neurological Surgery Group, and the Washington Brain and Spine Institute, P.C. Appellants, Dr. Sardul S. Pannu and his wife, Surinderjit G. Pannu appealed, alleging that the trial court erred in declining to give the proposed modified version of STANDARDIZED CIVIL JURY INSTRUCTION FOR THE DISTRICT OF COLUMBIA, § 5.03 (rev. ed. 2005) (hereinafter Instruction 5–3), which the appellants had specifically requested. Appellants maintain that the proposed instruction—"a reasonable doctor under the standard of care changes [his][her] conduct according to the circumstances or according to the danger [he] [she] knows, or should know, exists"; and that "as the danger increases, a reasonable doctor under the standard of care acts more carefully"—was a significant part of their theory of the case which was supported by evidence from expert witness testimony. We conclude that the trial court did not err by refusing to give the precise wording of the requested instruction, because it contained phrasing which could have confused the

jury regarding the applicable law. Nevertheless, it was incumbent upon the trial court to give the jury a fair and accurate statement of the law of negligence, in the context of a medical malpractice case involving neurological surgery. And, the failure of the trial court to give an instruction consistent with the legal principles set forth in this opinion constituted an erroneous exercise of discretion. Furthermore, we hold that the error was not harmless and thus constituted an abuse of discretion. Consequently, we reverse the judgment of the trial court and remand this case for a new trial.

## FACTUAL SUMMARY

The record on appeal shows that in April 2000, Dr. Pannu was a sixty-four-year-old chemistry professor with a history of lower back pain. Dr. Pannu consulted with Dr. Jacobson, who, after performing several diagnostic tests, recommended that Dr. Pannu undergo a decompressive lumbar laminectomy and a partial discectomy. Dr. Jacobson believed that Dr. Pannu was suffering from lumbar stenosis, a narrowing of the spinal channel, which compresses the nerves traveling through the lumbar spine to the legs. The surgery was intended to excise the posterior arch of the vertebrae, known as the lamina, and an intervertebral disc in order to relieve compression of the nerves of the spine.[1]

The surgery took place on June 9, 2000 at Suburban Hospital in Bethesda, Maryland. While working to remove the lamina from the lower portion of one of the lumbar vertebrae, known as L5, using manual bone-cutting instruments called rongeurs,

Dr. Jacobson inadvertently nicked the dura, the tough fibrous membrane covering the spinal cord; and created a one millimeter tear in it, apparently a relatively common complication of such surgery. Through the hole in the dura Dr. Jacobson could see the arachnoid, a thin, delicate, cobweb-like membrane that lies beneath the dura and encloses the spinal cord; however, no cerebrospinal fluid was leaking out and no nerves had been damaged.

Dr. Jacobson then moved to the upper portion of L5 and attempted to continue using the rongeurs. However, the fact that Dr. Pannu's dura was thinner than normal and very nearly stuck to the underside of the lamina made it difficult to separate the dura adequately from the bone. Dr. Jacobson determined that a high-speed, turbine, hand-operated drill would be an equally effective way of thinning the lamina to a thickness that would allow him to pick away the remaining bone with special instruments. He fit the drill with a five-millimeter burr, tested it, and used a small piece of cotton, known as a cottonoid, to protect the already exposed dura.[2] Since he could not place the cottonoid between the dura and the bone due to the inadequate spatial conditions, Dr. Jacobson laid the cottonoid on the exposed dura next to the bone and proceeded to drill, with one hand operating the drill and one hand operating the suction instrument.

As Dr. Jacobson continued to perform the surgery, his drill encountered a piece of bone of uneven consistency, which caused the drill to jump and land in the dural sac between the bone and the cottonoid near the area which had already been

1. All parties agree that this was an elective surgery and that Dr. Pannu was a proper candidate. Two of Dr. Pannu's three sons are neurosurgeons and he discussed the surgery with his family before deciding that it was the proper course of action for him.

2. Dr. Jacobson maintained that he used a cottonoid to protect the dura, even though his post-operative notes made no mention of the cottonoid.

torn. The drill severed several of Dr. Pannu's nerves, specifically those responsible for bowel and bladder control. Dr. Jacobson removed the nerves from the drill, put them back in the dural sac, sutured it closed, placed fibrin glue over it, and continued on with the operation, the remainder of which was successful.

Dr. Pannu lost bladder and bowel function and has no hope of regaining them.[3] Consequently, Dr. Pannu's life revolves around the time and labor intensive processes that he must undergo in order to urinate and defecate. He must catheterize himself every four hours in sterile environments to guard against urinary tract infections; he wears a diaper due to his total inability to control his bowels, and often must manually disimpact himself.

Dr. Pannu's injuries have caused him to suffer episodes of depression. He retired from his position as a tenured professor of analytical chemistry at the University of the District of Columbia due to his embarrassment over his inability to control his bowels. His social life has deteriorated as well as his intimacy with his wife. Appellants filed a medical malpractice action against appellees. Dr. Pannu sought compensatory damages for the loss of his bowel and bladder functions, and Mrs. Pannu claimed damages due to loss of consortium. The jury returned a verdict in favor of defendants/appellees.

## ANALYSIS

Dr. Pannu presents only one issue on appeal: whether the trial court erred in refusing to give a modified version of STANDARDIZED CIVIL JURY INSTRUCTION 5–3, which would have expressed appellants' theory of the case that, in a medical malpractice action, as the danger increases, a proportional change in conduct is required. Appellants contend that the trial court had no discretion as to whether or not to give the instruction because there was sufficient evidence in the record to establish a factual predicate for it. They cite testimony from medical experts from both parties, as well as the trial judge's conclusion that they had laid a factual predicate to substantiate their claim. They insist that no other instruction given by the trial judge adequately explained the legal principle that negligence is a relative concept and that consequently, the jury did not receive a complete and accurate set of instructions on the applicable law.

Appellees counter that the requested instruction was correctly refused because it is most appropriately given in general negligence cases, whereas it can be confusing to jurors in a medical malpractice suit. Appellees argue that in cases that do not involve expert witnesses, juries are expected to be able to draw upon their life experiences to determine what it means to "act more carefully" in a dangerous situation. However, they assert that juries are not expected, nor should an instruction tell them, to determine on their own what it might mean for a neurosurgeon to act more carefully during a surgery that involves working millimeters away from the spinal cord. Instead, they contend, juries are expected to listen to the expert testimony and conceptualize an understanding of the appropriate standard of care from what they believe was the most credible testimony. They assert that the jury was free to believe the appellants' expert testimony concerning what Dr. Jacobson needed to do to be more careful, but that an instruction telling the jury that Dr. Jacobson had to act more carefully would invite jury speculation. Moreover, they argue

---

**3.** All parties agree that Dr. Pannu's injuries occurred as a result of the surgery, and it is also uncontested that the injuries are extremely debilitating.

that judges retain some discretion in refusing requested jury instructions when it involves a legal, not factual, question. Finally, appellees contend that an overview of the complete set of jury instructions given by the trial judge reveals that he did provide a fair and accurate explanation of the law.

Before discussing the legal issue presented, and the arguments of the parties, we set forth pertinent background information. Then we articulate applicable legal principles.

### The Expert Testimony

Most of the trial testimony involved medical experts who were presented by both parties to explain to the jury what the appropriate national standard of care was in 2000 for a board-certified neurosurgeon performing the type of lower back surgery Dr. Jacobson had conducted on Dr. Pannu. Each side called two independent medical experts, and Dr. Jacobson testified for the defense. The testimony covered acceptable surgical techniques, equipment, and personnel used for the procedure including: the drill versus manual bone-cutting instruments; the type of drill; the size of the drill bit; the direction and motion of the drill; various items which could protect the dura during surgery; the use or non-use of an assistant as an extra pair of hands to help protect the dura; and the use of two hands versus one hand while operating the drill.

Dr. George Gruner and Dr. Lawrence F. Marshall, the medical experts for the appellants, each testified that Dr. Jacobson should have been more careful during the operation. At the time of the trial, Dr. Gruner was a board-certified neurosurgeon who practiced in Virginia.[4] Prior to testifying, he reviewed Dr. Pannu's medical records, including Dr. Jacobson's operative report, and Dr. Jacobson's deposition transcript. Dr. Gruner stated that "the closer you get to the dura, the more careful you have to be and the more likely you are to have an injury.... The most important goal is, number one, ... to prevent any type of injury to the nerve roots." When asked if it was his opinion that "the standard of care for a reasonably prudent Board Certified neurosurgeon require[s] him or her to take all necessary actions to protect against nerve injury," Dr. Gruner replied "Yes." (*Id.* at 229–30).

In Dr. Gruner's opinion, which was based on the operative report, Dr. Jacobson's deviation from the standard of care was demonstrated by his failure to use a cottonoid to adequately protect the dura. He testified that:

> The original operative report does not state anything about putting a cottonoid toward the dura, about using any type of measure to protect the dura the way one normally would. It's because of that I said this was below the standard of care.

**4.** After finishing Medical School at Northwestern University in 1964 and his internship, he served in the armed forces before spending four years at the Neurological Institute and receiving additional training in neurosurgery at Northwestern, and neuropathology at Loyola University. He entered practice in 1972, and became board-certified by the American Board of Neurological Surgery in 1975. He practiced in California for ten or eleven years before moving to Virginia in 1983. At the time of trial, he had performed six or seven thousand operations on the spine (between two thousand and twenty five hundred were lumbar), and over seven hundred laminectomies. He regularly reads journals in the field of neurosurgery, such as the Journal of Neurosurgery and the American Spine Journal, and attended national professional meetings, including those sponsored by the American Association of Neurological Surgery and the Congress of Neurological Surgeries. Dr. Gruner does not teach neurosurgery residents (there are none at the community hospital where he works), and has authored only one article (during his residency).

The dura in this situation, especially because it was thinned, needed to be adequately protected.[5]

Dr. Gruner believed that if the cottonoid had been used in "the appropriate manner . . . more likely than not [ ] it [would] have been effective." (*Id.* at 240). Dr. Gruner also discussed other possible methods of protecting the dura. While recognizing that the national standard of care is not based on his own practice, Dr. Gruner noted that his technique when drilling bone involved the "use [of] two hands. Some surgeons use one hand. Both are appropriate. With both methods you're trying to [maintain] control . . . whenever you use a drill there is a tendency for the drill to kick." (*Id.* at 233). When questioned about the drill specifically Dr. Gruner commented that neurosurgeons sometimes use "diamond drills. The advantage of a diamond drill is it doesn't drill as rapidly and it's finer. It takes much longer and you go just minutely. We use it around the brain stem. In this area most people will not use a diamond drill." [6] (*Id.* at 234). As for the burr size, Dr. Gruner testified, "[a]s a general rule you can state the larger the burr size the more likely it is to kick," and that the bit Dr. Jacobson used was "on the medium to large size." (*Id.* at 234–35). Dr. Gruner also mentioned that if a doctor didn't use a cottonoid to protect the dura, "one would use a piece of metal, if one could get that in there properly. Having the assistant control [the metal retractor] as well." (*Id.* at 241). Dr. Gruner testified that it was possible to use the rongeurs throughout such an operation and that "the advantage of the [rongeur], as opposed to the drill, is the fact that . . . your hand has total control of that instrument, [so] you can do it slowly." [7] (*Id.*) Finally, as his direct testimony drew to a close, Dr. Gruner stated his opinion that Dr. Jacobson "deviated from the normal standard of care . . . [b]y not adequately protecting the dura at a time when it was most liable for injury."

On cross-examination, Dr. Gruner acknowledged that Dr. Jacobson did not list a number of items in his operative report that he actually used during Dr. Pannu's surgery. On redirect examination, Dr. Gruner was again asked how Dr. Jacobson deviated from the standard of care. He responded, in part:

In reading the original operative report there is no mention . . . made of any type of protection that was offered to the dura at the time he was drilling. That's very important to a[n] incident like this. Anytime an untoward event occurs, a prudent neurosurgeon would dictate immediately their operative note, what happened, what they did, while it's still fresh in their mind. . . . The original operative report does not state anything about putting a cottonoid toward the

---

5. Dr. Gruner was asked:

 Based upon your review of those records [the operative report and Dr. Jacobson's deposition] and given all of the experience you have with respect to the performance of these thousands of procedures that you have done, have you been able to formulate an opinion as to whether or not the defendant acted within the standard of care?

 He replied:

 It was my feeling based on reading the operative report, the records, that it was below the standard of care, what was done

prior to the time that . . . the drill entered the dura.

6. Dr. Jacobson did not use a diamond drill. He testified that "they remove bone very slowly. They generate a great deal of heat and they're generally used . . . in the brain. . . ."

7. Dr. Gruner later testified that while rongeurs could be used effectively to perform the surgery, "in this day and age I would say that of neurosurgeons . . . everyone uses [drills]."

dura, about using any type of measure to protect the dura the way one normally would. It's because of that instance that I said this was below the standard of care. The dura in this situation, especially because it was thinned, needed to be adequately protected. Now, how you protect it, there are various methods. I use one method. Dr. Jacobson may use one method. Other doctors may use another method. But you try to use every method humanly possible to protect that dura because the consequences of not protecting can be disastrous, as it was.

Dr. Marshall was the other board certified neurosurgeon presented by appellants.[8] He supported Dr. Gruner's views, testifying that "the issue is when you have the possibility or probability of direct dural contact with a drill, then every precaution has to be exercised." Dr. Marshall, testified that "the standard [of care] requires appropriate precautions be taken to protect the dura." He declared: "In a straight forward lumbar stenosis case ... there is a relationship between the poten-

tial of operator error and increased nerve root injury." When asked if such precautions include using "some object, be it cotton, be it fiber, be it metal, be it plastic," to protect the dura, Dr. Marshall answered, "what you have enumerated, yes ... I think some mechanism of protection of the dura, cotton, another instrument is generally required." (*Id.* at 467–70). He also asserted that "[i]f you have multiple injuries to a nerve root, to nerve roots using a drill you have violated the standard of care." (*Id.* at 371). Moreover, in Dr. Marshall's opinion, it is "highly unlikely" that Dr. Jacobson would have severed the specific nerves that he did if he had been drilling in the proper direction—from medial to lateral (inside out).[9] (*Id.* at 397).

However, when pressed by appellants' own counsel as to what "the standard of care specifically require[d] of Dr. Jacobson ... to prevent against [Dr. Pannu's] injury," Dr. Marshall replied, "I think that's a complex question because [ ] one isn't there." (*Id.* at 401). Although he could not testify that there were specific require-

---

8. Dr. Marshall served as head of neurosurgery at the University of California at San Diego, a large teaching hospital complex. At the time of trial, there were ten neurosurgeons in the division headed by Dr. Marshall. In addition, Dr. Marshall was in charge of training residents in neurologic surgery. Previously, Dr. Marshall also was part of a joint program with the Chair of Orthopedics, who was then a "nationally known spine surgeon." The program was designed to train spine fellows, orthopedists, or "neurological surgeons in more complex techniques in spine surgery...." Dr. Marshall authored a chapter in a textbook addressing complications from "lumbar spine" surgery, including complications from drilling. He also contributed "a couple of chapters" for a book entitled, THE SPINE. Part of his contribution discussed "precautions one can take with a drill to minimize the possibility of a mishap." Dr. Marshall estimated that he has authored between 250 and 300 publications. In addition, Dr. Marshall held editorial positions on two major professional journals—the Journal of Neurosurgery, and the Neurosurgery spine journal. He has lectured widely at various universities, including his "home institution," U.C.L.A., and for specialized entities such as NATO. Dr. Marshall had performed over two thousand surgeries on the lower back region. He estimated that he had used a high speed drill during lumbar surgery approximately 2000 times.

9. Dr. Marshall was asked:

Do you think it's possible that if Dr. Jacobson was drilling from medial to lateral, inside out, and the drill jumped or bumped[,] that he could go all the way over to the right side and take out all of those nerves to a reasonable degree of medical probability?

He answered:

No, I think that is highly, highly unlikely. I don't—I could not imagine that.

ments demanded by the standard of care, Dr. Marshall did offer alternate techniques that Dr. Jacobson could have used to prevent Dr. Pannu's injuries, in large part echoing Dr. Gruner. He mentioned that a neurosurgeon could 1) use the suction device or bayoneted forceps as protective instruments to provide a barrier for the dura; 2) reduce the torque on the drill or the air pressure to reduce the drill speed; or 3) use bone cutting instruments. (*Id.* at 401–03). He stated that, at a minimum, the standard of care required that Dr. Jacobson maintain control of the drill "every second during the surgery," and in his opinion Dr. Jacobson did not control the drill within the standard of care because "the degree of movement of the drill ... [was] inconsistent with adequate control of the drill." (*Id.* at 406–10). He acknowledged that in using a drill to remove bone, the surgeon may confront "different bone consistencies," which may cause the drill to kick or move. But, "that doesn't happen most of the time.... It happens.... But it's unusual...."

Dr. Jacobson, and the experts testifying on his behalf, attempted to counter Dr. Gruner and Dr. Marshall's testimony by asserting that despite the increase in danger to the nerves that resulted from the first tear in the dura, there was nothing physically different that he could have done to provide more protection for the dura once it had been torn.[10] Dr. Jacobson testified that although Dr. Gruner was correct that he had not written in the original operative report that he had used a cottonoid to protect the dura, that was

simply a mistake in his own dictation because it was his common practice to place a cottonoid in the area to protect the dura and he had done so during Dr. Pannu's surgery. He admitted that the standard of care required him to "protect and be cognizant of where the dura is," but maintained that there was no single correct way to do so. He pointed out that "[t]here are some surgeons who put absolutely nothing there [to protect the dura]. Their protection is the skill and environment in which they're working." (*Id.* at 199).

Dr. Jacobson further testified that he felt the safest and most comfortable when using one hand on the drill because he was taught "that it was safer ... [to] use the suction with one hand and the drill with the other"; and that he avoided techniques that call for an additional pair of hands because "although there are four hands, there are really only two eyes ... I can't control [an]other person's hand.... I don't like to trust, under those circumstances, the actions of another person that can't see what's going on." (*Id.* at 194–97). Dr. Jacobson insisted that his use of the drill was appropriate, that the size and substance of the drill bit met the standard of care, and that he tested the drill before the operation began and it had performed well. (*Id.* at 177–79). Essentially, he testified that he met the standard of care at all times and that there was nothing procedurally safer that he could have done to protect the dura.

The medical experts testifying on behalf of Dr. Jacobson corroborated his view. Dr. Mark Shaffrey, a board-certified neu-

10. Dr. Jacobson received his Bachelor of Arts with distinction from the University of Rochester and went on to graduate from medical school at George Washington University (GWU) in 1977. He remained at GWU for the next six years, training a year in general surgery and then five years in neurosurgery. He began his practice of neurosurgery in 1983 and became Board Certified in either 1985 or 1986. At the time of the trial he had performed over 2,000 lumbar procedures and had experience with close to 1,000 cases of lumbar stenosis. In addition to operating on the spine, his practice also included brain surgery.

rologist at the time of the trial was the medical director of the University of Virginia's Neuroscience Service Center and professor of neurosurgery at the University of Virginia Hospital (through the University of Virginia School of Medicine).[11] Dr. Shaffrey reviewed record documents, including deposition transcripts and Dr. Jacobson's operative report. He was asked his opinion as to "whether or not the care and treatment during the course of the surgery on June 9, 2000, by Dr. [ ] Jacobson, and the surgery of Dr. Pannu met the applicable standard of care of reasonable conduct by a board certified neurosurgeon in the performance of that surgery?" He replied: "I believe it met the standard of care." In explaining his response, he testified that "it would [not] be possible to say that there's any one technique in any situation that would embody the standard of care. Therefore, they're [sic] going to be many techniques to do the same job that basically are all acceptable." When asked whether Dr. Jacobson's use of a high-speed drill to remove or thin a thickened piece of lamina was "in accordance with the standard of care," Dr. Shaffrey replied in the affirmative. (Id. at 89). He testified that when "the dura is thinned ... normally you can't use the punches and the Rongeurs without destroying the joints or compromising the stability of the spine. That's why we use the drill." (Id. at 133).

Dr. Shaffrey was asked about each of the techniques used by Dr. Jacobson and despite admitting that "for me, rough surfaces [on the bone] are areas where you have to pay a lot of attention," he did not indicate that there was anything more that Dr. Jacobson could have physically done to protect the dura. (Id. at 133). In fact, he testified that Dr. Jacobson was "not required" under the standard of care to use anything to "separate the drill from the [exposed dura]," because he had often seen other specialists perform the surgery successfully without using any barrier. (Id. at 104–05). Concerning the standard of care and "the direction that a physician drills the lamina in the spine during a lumbar stenosis at the L4/L5 level," Dr. Shaffrey stated: "I'm not aware of any standard for the direction that the drill should be used." He added, "you have to be prepared when you do an operation like this for the bone to be of various consistencies, thicknesses, hard, soft, all of those instances. And you're not sure ... before you start what those are going to be. You have to go in and assess the situation as you go." He rejected the correlation between "the number of nerve roots that were injured" and the "control of the drill." Several nerve roots could be injured if the drill traveled only "a short distance" because "[a] lot of nerve roots in the thecal sac are tied together with little

11. As an undergraduate, Dr. Shaffrey attended Virginia Tech, and received degrees in biology and biochemistry in 1983. He completed his medical education at the University of Virginia Medical School in 1987, his internship in general surgery at the United States Air Force Medical Center in San Antonio, and his neurosurgical residency at the University of Virginia Hospital. After a tour of duty at the Kiesler United States Air Force Medical Center in Biloxi, Mississippi, he returned to the University of Virginia Hospital as an associate professor of neurosurgery, where he rose to the rank of professor of neurosurgery and vice chair of the Department of Neurosurgery. He has authored or co-authored approximately 50 articles, has reviewed papers to determine whether they should be published in the Journal of Neurosurgery, and has given lectures at other medical centers as well as at national professional meetings. In addition to teaching neurosurgery to medical students and residents, lecturing, and writing, Dr. Shaffrey has performed 2000 to 2500 spinal surgeries, including approximately one thousand surgeries in the lumbar region of the spine.

strands of something called arachnoid, which means spider web[, and] .... if you hit the arachnoidal membrane, you can automatically wrap up or lacerate several [nerve roots]." With regard to the use of the cottonoid to protect the dura, defense counsel asked Dr. Shaffrey: "[I]n the year 2000 in June of that year, did all board-certified neurosurgeons practicing acceptable care use cottonoids to protect the thecal sac or the dura and its contents when drilling on the lamina near the edge of the lamina?" He replied: "No." During "the course of operating with other competent neurosurgeons," Dr. Shaffrey "often" "observed [ ] other specialists using no barrier device when using a drill" with one hand.

Dr. Donlin Long was the other defense board-certified neurosurgeon.[12] He testified that the tragic result of Dr. Pannu's surgery was

> simply one of those unfortunate complications that you cannot completely avoid if you're going to do this kind of surgery.... I certainly wouldn't prescribe a way and say that's the only way it can be done.... [It d]epends on what you're

comfortable with, how you've learned it, and how you think you do it best.... There are just many ways to use that drill.

(*Id.* at 159–62). Dr. Long further asserted that "there's nothing that anybody has ever worked out that's a sure protection.... [T]here is just no instrument made for that purpose. There's nothing you can do that will definitely prevent this from happening." (*Id.* at 165).[13] He noted that a dural tear of the sort Dr. Jacobson first made was not a violation of the standard of care; it happens in five to ten percent of surgeries. (*Id.* at 160–61).

In addition, Dr. Long commented that it was "perfectly appropriate" for Dr. Jacobson to use the drill during the surgery, and that there was no single correct direction in which surgeons are required to move the drill under the standard of care. (*Id.* at 157). However, he did say that "the standard technique is to use one hand on the drill, one hand on the suction. That's the way I teach everybody to work. There are other ways to do it. Some people like to use two hands on the drill."[14] (*Id.* at

12. Dr. Long attended Jefferson Junior College in Missouri, followed by three years of undergraduate study at the University of Missouri. He entered the medical school at the University of Missouri without obtaining his undergraduate degree, and finished medical school in 1959. He served his internship in surgery at the University of Minnesota, where he also earned his Ph.D degree in neuroanatomy in 1964, during his residency in neurosurgery. He received specialized training in pediatric neurosurgery at Harvard and the Boston Children's Hospital, and then served as a clinical associate in the neuropathology laboratory at the National Institutes of Health from 1965 to 1967. Thereafter, he was appointed to the faculty at the University of Minnesota, worked as chief of neurosurgery at the Minneapolis VA Hospital for six years, and became board-certified in 1968. In 1973, he accepted the position of chief of neurosurgery at Johns Hopkins University and served in that capacity until August 2000. During his career, he trained approximately 150 to 160 neurosurgeons, lectured widely, wrote 239 professional articles and 85 chapters in books, and served as an editor in the field of neurosurgery. He has performed thousands of surgeries, including the removal of acoustic tumors, and over one thousand lumbar stenosis surgeries, and as of the date of trial, continued to perform neurosurgeries.

13. Dr. Gruner, one of appellants' medical experts, also testified "[l]et me say a caveat is there is nothing that I can do that can guarantee a hundred percent. There is nothing [ ] that we do in neurosurgery that guarantees anything a hundred percent."

14. Appellants attempted to impeach Dr. Long on this point by asking him about a different case in which he testified that two hands were necessary to operate a drill. On re-direct, Dr. Long testified, "in a circumstance where you

167). Dr. Long agreed with Dr. Shaffrey that a cottonoid was not required as part of the standard of care; in fact, he asserted that "[t]he cottonoid is no barrier to th[e] drill," and that when he used the drill he "almost never ha[s] protection in." (*Id.* at 164–65).

### The Jury Instructions

At trial, the judge made few comments as to why he ultimately chose not to grant appellants' request for Instruction 5–3; instead, he allowed both sides to make their arguments as to its inclusion or exclusion and then made a brief and summary decision. Thus, the arguments made by the two sides during the instruction selection process are instructive.

Initially, appellants requested that both Instruction 5–3 and STANDARDIZED CIVIL JURY INSTRUCTION FOR THE DISTRICT OF COLUMBIA, § 5.02 (rev. ed. 2005) (hereinafter Instruction 5–2) be given to the jury. These instructions are included in section five of the STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, relating to "Negligence." Instruction 5–2 reads:

> Negligence is the failure to exercise ordinary care. To exercise ordinary care means to use the same caution, attention or skill that a reasonable person would use under similar circumstances. It is negligent to do something that a person using ordinary care would not do. It is also negligent to fail to do something that a person using ordinary care would do.

Instruction 5–3 reads:

> Negligence is a relative concept. A reasonable person changes [his] [her] conduct according to the circumstances or

according to the danger [he] [she] knows, or should know, exists. Therefore, as the danger increases, a reasonable person acts in accordance with those circumstances. Similarly, as the danger increases, a reasonable person acts more carefully.

Appellees objected to both instructions, arguing that they would lead the members of the jury to make their own determination of what reasonable care should be, rather than considering the views of experts who testified about the national standard of care in a case involving specialized medical training, and specialized surgery.

At first, the court agreed with appellees, stating that the general negligence standard was inapplicable in this case and that the proper jury instructions could be found in section nine of the STANDARDIZED CIVIL JURY INSTRUCTION FOR THE DISTRICT OF COLUMBIA, "Medical Malpractice and Other Professional Negligence." Specifically, the court concluded that STANDARDIZED CIVIL JURY INSTRUCTION FOR THE DISTRICT OF COLUMBIA, § 9.07 (rev. ed. 2005) (hereinafter Instruction 9–7) was the appropriate explanation of the standard of care. Instruction 9–7 reads:

> [Defendant] is a nationally-certified specialist in [neurosurgery]. The standard of care for a nationally-certified specialist is to have and use the same degree of care, skill and learning that are ordinarily possessed and used by a nationally-certified specialist in [neurosurgery] acting in a reasonable and prudent manner in the same or similar circumstances.

However, appellants were able to persuade the court that Instruction 5–3 could be tailored to accommodate the concerns of the court and appellees.[15] Appellants

---

think you have exceptional risk, then two hands on the drill is the rule." However, when doing "routine drilling ... even in much more delicate areas than in the spine,

which we weren't talking about, I use one hand routinely. It's standard technique."

15. Appellants did not attempt to persuade the court that Instruction 5–2 should be given.

were willing to modify Instruction 5–3 so that "reasonable person" would be replaced with "reasonable doctor under the standard of care." The modified version of Instruction 5–3 would have read:

> Negligence is a relative concept. A *reasonable doctor under the standard of care* changes [his] [her] conduct according to the circumstances or according to the danger [he] [she] knows, or should know, exists. Therefore, as the danger increases, a *reasonable doctor under the standard of care* acts in accordance with those circumstances. Similarly, as the danger increases, a *reasonable doctor under the standard of care* acts more carefully.

(emphasis added). Appellants contended that this proposal would alleviate any concerns that the instruction would lead jurors to make their own determinations of the standard of care.

The trial judge appeared to be persuaded by appellants' contention, noting "[w]e tailor instructions to particular cases all the time," but gave appellees the opportunity to object. (*Id.*). Appellees objected that the modified version of Instruction 5–3 would still be prejudicial because it amounted to the court defining the standard of care for the jury. Appellees argued that the crux of the case depended on whether or not the standard of care called for Dr. Jacobson to do more than he did at any time during the surgery. Appellees asserted that it was for the jury to decide whether the most credible expert testimony supported the appellants, who believed that Dr. Jacobson should have changed his conduct, or the appellees, who contended that Dr. Jacobson's conduct met the standard of care. Appellees continued: "[Instruction 5–3] accepts as a proposition that [Dr. Jacobson] should have done something differently in the handling of that

drill which feeds directly into the plaintiffs' theory of the case. . . ." (*Id.* at 129).

Appellees' argument was momentarily convincing to the trial judge, despite the fact that the court agreed with appellants that there was evidence in the record that demonstrated that Dr. Jacobson needed to change his conduct. The trial court commented, "the question is the jury instructions, they have to be statements of the law. The question is whether this is a statement of law or whether it's a statement of fact. . . ." (*Id.* at 132). Appellants reiterated that they believed the modified version of Instruction 5–3, which eliminated the reasonable person issue, was valid because "it is a truism in personal injury litigation that the duty of anyone rises or is heightened by the degree of danger. . . . That has to be a truism whether or not you are driving a car or whether you are doing brain surgery." (*Id.* at 133).

Again the trial judge was swayed by the appellants' arguments, and in fact, agreed at one point to give the instruction, saying "I am going to give it." (*Id.* at 134). However, upon further discussion, appellees were finally able to convince the trial court that Instruction 5–3 was prejudicial. As appellees made their argument the court noted, "[the plaintiffs'] theory of the case from their experts has been that if you are going to move toward the lamina, there needs to be some protection. . . . Your experts have said it is not necessary to do that." (*Id.* at 136–37). Appellees seized on this and replied:

> Which is why, Your Honor, if you give this instruction, you are giving my precise point. You are adopting the plaintiffs' theory as a legal precedent that the standard of care requires him to alter his conduct and to alter it from what? . . . . That's why this is not appropriate. [Opposing c]ounsel states to this Court that there is not adequate cover-

age in the 9 series? There most assuredly is. It is what the standard of care testimony is and how that is derived by expert testimony. His experts can say what they want. He can argue what he wants. If [the jury] accepts it, so be it. *But, for the court to tell the jury that he had to change his conduct, that is a different ball game.*

(*Id.* at 137) (emphasis added). Despite appellants' contention that "a party is entitled to an instruction in the case that correctly sets forth the law and that correctly sets forth the facts that [we] have introduced in the case," the trial court responded "I am going to deny it. You will be able to argue [your point].... But, I won't give an instruction on it." (*Id.* at 138).

During the jury instruction phase of the trial, the judge kept true to his word and did not give an instruction similar to Instruction 5-3. Instead, his instructions were patterned after the series of instructions in section nine of the STANDARDIZED CIVIL JURY INSTRUCTIONS:

The plaintiff, Doctor Pannu, claims that the defendant, Doctor Jacobson, failed to treat him with the same degree of skill, care, or knowledge required of a doctor acting in the same or similar circumstances and that the defendant's failure was a proximate cause of injury to the plaintiff.

Now, the plaintiffs' theory in this case is that the defendant was negligent in performing the surgery on Doctor Pannu by failing to maintain complete control of the drill while he was drilling near the already exposed and torn dura and by failing to use adequate precautions to prevent injury to the nerves in that area.

The plaintiff contends that as a result, the drill tore through the dura causing bilateral nerve damage. In this case, there is no dispute that the result of this surgery is permanent incontinence. Therefore, if you find that the surgery was performed beneath the standard of care for a reasonably prudent board-certified neurosurgeon, then you are instructed to award damages.

A doctor is not negligent if he or she adheres to the standard of care in the field. You must decide whether the defendant was negligent by deciding whether the defendant failed to perform according to the professional standard of care. To make this decision, you must answer this question: Did the defendant do what a reasonably [sic] and prudent professional in his or her field would have done under similar circumstances? To be entitled to your verdict, the plaintiff must prove by a preponderance of the evidence the following: 1) What is the standard of skill and care that reasonably competent professionals follow when acting under the same or similar circumstances? 2) That the defendant, Doctor Jacobson, did not follow that standard of skill and care.

A doctor is not negligent simply because his or her efforts are not successful. Unsatisfactory results from treatment or care alone do not determine whether the defendant, Doctor Jacobson, was negligent in treating the plaintiff, Doctor Pannu.

However, if the doctor's performance fell below the standard of care and thereby proximately caused the patient's injuries, then the doctor was negligent. In such circumstances, it is no defense to a charge of negligence that the doctor did the best that he could and that those efforts simply were not successful.

Doctor Jacobson is a nationally certified specialist in neurosurgery. The standard of care for a nationally certified neurosurgeon is to have and to use the

same degree of care, skill and learning that are ordinarily possessed and used by a nationally certified specialist in neurosurgery acting in a reasonable and prudent manner in the same or similar circumstances.

You can only determine the professional standard of care required of the defendant from the testimony of the expert witnesses regarding the standard. You should consider each expert's opinion and weigh his or her qualifications and the reasons for each opinion.

### Standard of Review

 "In a medical malpractice action, there are three elements a plaintiff must show to establish a prima facie case: '(1) the applicable standard of care; (2) a deviation from that standard of care by the defendant; and (3) a causal relationship between *that deviation* and the plaintiff's injury.'" *Burke v. Scaggs,* 867 A.2d 213, 217 (D.C.2005) (emphasis in original) (quoting *Talley v. Varma,* 689 A.2d 547, 552 (D.C.1997)). "[I]n view of the uniform standards of proficiency established by national board certification," the standard of care for board-certified physicians "is to be measured by the national standard." *Morrison v. MacNamara,* 407 A.2d 555, 565 (D.C.1979). Moreover, "the use of expert testimony is required since the subject is 'not likely to be within the common knowledge of the average layman.'" *Allen v. Hill,* 626 A.2d 875, 877 (D.C.1993) (quoting *District of Columbia v. Barriteau,* 399 A.2d 563, 569 (D.C.1979)). "Establishing the standard of care is essential to a prima facie case of negligence because physicians are not expected to be perfect . . .; they are liable in negligence only when their behavior falls below that which would be undertaken by a reasonably prudent physician," and there is a causal relationship between that behavior and a plaintiff's injury. *Burke, supra,* 867 A.2d at

217. "[T]he duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes. It is this notion of specialized knowledge and skill which animates the law of professional negligence." *Morrison, supra,* 407 A.2d at 560; *see also* RESTATEMENT (SECOND) OF TORTS ("the Restatement") § 289, Comment m (1965).

 It is clear that "a party is entitled to a jury instruction upon the theory of the case if there is sufficient evidence to support it." *George Washington Univ. v. Waas,* 648 A.2d 178, 183 (D.C.1994). However, "[a] trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997) (internal quotation marks omitted) (quoting *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 625 (D.C.1986)). "[I]n determining whether a proposed instruction on a party's theory of the case was properly denied, we review the record in the light most favorable to that party." *Nelson,* 694 A.2d at 901.

### Legal Discussion of the Jury Instructions

This case presents a question concerning two different legal principles. Appellants claim that the classic case on jury instruction appeals is *Nelson, supra,* in which we noted that "[a] party is entitled to an instruction on his or her theory of the case if the instruction is supported by the evidence." 694 A.2d at 901 (internal quotation marks omitted) (quoting *Nimetz v. Cappadona,* 596 A.2d 603, 605 (D.C.1991)). Viewed in the light most favorable to ap-

pellants, there was sufficient evidence in the record upon which a jury could have decided that Dr. Jacobson needed to adjust his technique during the surgery once it was apparent that the dura had been torn. Dr. Jacobson himself admitted that he had a heightened duty to be more careful in light of the fact that the dura was thin, and other experts who testified agreed that a torn dura made the surgery more complex and fraught with peril than it normally would be. The trial judge even stated that "[he] agree[d] with [the plaintiffs] that the facts support [the instruction]." Therefore, appellants insist that under *Nelson, supra,* they were entitled to the modified version of Instruction 5–3.

Appellees discount the legal principle on which appellants rely, maintaining that *Nelson* can be distinguished from the present case because in *Nelson* the judge made a clear factual mistake by declining to instruct the jury on the plaintiff's theory of the case; he mistakenly believed that the plaintiff had not adduced any evidence to support the theory. As the transcript for that case revealed, however, the judge's memory was incorrect. Consequently, we held that the plaintiff's "expert testimony provided an evidentiary predicate for this aspect of plaintiff's theory of the case, and it was therefore error for the judge to refuse, upon request, to instruct the jury on that theory." *Id.* at 902.

Appellees emphasize *Waas, supra,* where we declared that a party cannot simply rely on "the proposition that a specific instruction must be given when there is evidence to support it. [Such] reliance is misplaced." 648 A.2d at 184. We based our conclusion in *Waas* on the legal principle that a specific jury instruction should be given when it is "necessary to explain to the jury specialized legal doctrine that was not adequately described in the general instruction nor readily apparent to the

jury." *Id.* In discussing both *Waas* and *Nelson,* we noted two key questions regarding jury instructions presented by those cases: 1) was the trial court's assessment of the existence of a factual predicate for the requested instruction correct; and 2) was the trial court's instruction, considered as a whole, a fair and accurate statement of the applicable law? In *Nelson, supra,* we did not need to analyze the case beyond the first question because the trial court had made an incorrect factual determination. *See also Gubbins v. Hurson,* 885 A.2d 269, 280 n. 4 (D.C.2005) ("[T]he court's decision to issue or refuse to issue instructions should be the result of an informed choice among permissible alternatives, which is the essence of an appropriate exercise of discretion; thus, the decision must be based upon and drawn from a firm factual foundation.") (citations and internal quotation marks omitted); *Westbrook v. Washington Gas & Light Co.,* 748 A.2d 437, 439–42 (D.C.2000) (affirming the trial court's finding that there was no evidence in the record to support a last clear chance doctrine instruction). *Waas* focused primarily on the second question, the fairness and accuracy of the jury instructions given by the trial court. *See also Crutchfield v. United States,* 779 A.2d 307, 332–33 (D.C.2001) ("[t]he jury instructions at appellant's trial explicitly set the appropriate standard of proof. . . ."); *Hawthorne v. Canavan,* 756 A.2d 397, 402 n. 7 (D.C.2000) ("the instructions as a whole were fair and accurate, and the judge did not abuse his discretion by refusing to give the specific instructions requested by plaintiff").

Here, the pivotal question, as in *Waas,* is the fairness and accuracy of the final instruction given to the jury, without appellants' proposed modified Instruction 5–3. The trial judge did not deny the instruction because of a lack of evidentiary support, but rather because he was con-

cerned that it did not fairly and accurately express the law. In examining the trial judge's concern and the instruction given, the question we confront is whether STANDARDIZED CIVIL JURY INSTRUCTION 9–7, in combination with the other instructions given by the trial court, was a fair and accurate statement of the applicable law, or whether the modified version of STANDARDIZED CIVIL JURY INSTRUCTION 5–3 as proposed by the appellants was a "major legal principle[ ] that the jury needed to render a verdict." *Waas, supra,* 648 A.2d at 184. To answer these questions, we need to examine more closely our precedents in negligence cases, including matters pertaining to professional negligence.

In *D.C. Transit Sys. Inc. v. Carney,* 254 A.2d 402 (D.C.1969), we discounted the notion that "a common carrier ... [is] held to the 'highest degree of care.'" *Id.* at 403. Rather, we declared: "[T]here are no categories of care, i.e., the care required is always reasonable care. What is reasonable depends upon the dangerousness of the activity involved. The greater the danger, the greater the care which must be exercised." *Id.* (citing *Becker v. Colonial Parking, Inc.,* 133 U.S.App. D.C. 213, 409 F.2d 1130 (1969)). We elaborated on these legal principles in *Blumenthal v. Cairo Hotel Corp.,* 256 A.2d 400 (D.C. 1969), a case involving a tenant's negligence action against a landlord: "The parties to this appeal have argued at length over the degree of care which appellee owed appellant. This jurisdiction does not recognize varying standards of care depending upon the relationship of the parties but always requires reasonable care to be exercised under all the circumstances." *Id.* at 402 (citing *Carney, supra*) (other citation omitted); *see also Sandoe v. Lefta Assocs.,* 559 A.2d 732, 738 (D.C.1988) ("In the District of Columbia, the applicable standard for determining whether an owner or occupier of land has exercised the

proper level of care to a person lawfully upon his premises is reasonable care under all the circumstances.") (citations omitted).

▮ We made clear in *Morrison, supra,* that these basic but fundamental principles of negligence law also are applicable in professional negligence cases: "[The] standard of care, which evaluates a defendant's conduct against that conduct which is reasonable under the circumstances, is also applicable in the law of professional negligence. The law of negligence generally does not acknowledge differing standards of categories of care, but requires an adherence to a uniform standard of conduct: that of reasonable care under the circumstances," 407 A.2d at 560 (citing *Blumenthal, supra,* 256 A.2d at 402; *Carney, supra,* 254 A.2d at 403). Thus, the context of a medical negligence action is critical to a determination of what constitutes "reasonable care under the circumstances." As we said in *Washington Metro. Transit Auth. v. Jeanty,* 718 A.2d 172 (D.C.1998), "the standard is always contextual, and [in a common carrier case], the carrier's relation to, and duties toward, its passengers constitute the critical context in which the carrier's conduct is evaluated." *Id.* at 175. So, too, the neurosurgeon's relation to and duties toward his patient constitute the critical context in which the neurosurgeon's conduct is evaluated. As we stressed in *Drevenak v. Abendschein,* 773 A.2d 396 (D.C.2001), "the standard of care focuses on 'the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances.'" *Id.* at 416–17 (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C. 1984)). Here, what course of action a reasonably prudent doctor with Dr. Jacobson's specialty would have taken under the same or similar circumstances encountered by him during his surgery on Dr. Pannu

depends upon expert testimony concerning the national standard of care. As we declared in *Strickland v. Pinder*, 899 A.2d 770 (D.C.2006): "At the outset of a medical malpractice case, the 'plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances.'" *Id.* at 773 (quoting *Meek, supra*, 484 A.2d at 581) (citing *Morrison, supra*, 407 A.2d at 560–65). It is with these fundamental legal principles in mind that we examine appellant's proposed modified instruction which, as we have indicated above, reads as follows:

> Negligence is a relative concept. A *reasonable doctor under the standard of care changes [his] [her] conduct according to the circumstances or according to the danger [he] [she] knows, or should know, exists.* Therefore, as the danger increases, a reasonable doctor under the standard of care acts in accordance with those circumstances. *Similarly, as the danger increases, a reasonable doctor under the standard of care acts more carefully.* (Emphasis added.).

 Our review of the record persuades us, for the following reasons, that the trial court did not abuse its discretion by refusing to give appellants' requested modified instruction, using the precise proposed language. First, the trial court correctly perceived that appellants' proposed wording of the charge, standing alone, may have confused the jury as to how it was to determine the national standard of care. Counsel for appellants requested that the court instruct the jury that the level of

care required when using a drill to perform a laminectomy must increase as the danger to the exposed dura increases. Under most circumstances this concept regarding the "duty" element of negligence is undisputably true, because, as we have said, "there are no categories of care, i.e., the care required is always reasonable care. What is reasonable depends upon the dangerousness of the activity involved. The greater the danger, the greater the care which must be exercised." *Carney, supra*, 254 A.2d at 403. However, under the virtually undisputed evidentiary facts presented here, the rule set forth in *Carney* would be inapplicable if, and only if, Dr. Jacobson had already been acting as carefully as required by the heightened danger even prior to the onset of that increased danger. If this were the case, then it would not have been necessary for Dr. Jacobson to act even *more* carefully following the initial tear of the dura, or to change his conduct. Consequently, appellants' proposed phrasing of the requested instruction might have incorrectly suggested to the jury that, regardless of how careful Dr. Jacobson had been in conducting the surgery prior to the first tear of the dura, he was obliged to affirmatively modify his actions subsequent to that incident.

In *Morrison* we looked to the RESTATEMENT (SECOND) OF TORTS § 289[16] Cmt. m (1965) in recognizing that reasonable care for a specialist depends upon his or her specialized knowledge or "superior qualities." 407 A.2d at 560. Consistent with § 289 of the Restatement, our standard-

---

**16.** Section 289 Cmt. m of the Restatement states:

> The standard of the reasonable man requires only a minimum of attention, perception, memory, knowledge, intelligence, and judgment in order to recognize the existence of the risk. If the actor has in fact

> more than the minimum of these qualities, he is required to exercise the superior qualities that he has in a manner reasonable under the circumstances. The standard becomes, in other words, that of a reasonable man with such superior attributes.

ized Instruction 9–7, focuses on the "degree of care, skill and learning that are ordinarily possessed and used by a nationally-certified specialist [in neurosurgery] acting in a reasonable and prudent manner in the same or similar circumstances." As contemplated by § 298 Cmt. a, "[t]he word 'care' denotes not only the attention which is necessary to perceive danger, but also the caution required to avert it once it is perceived." Yet, neither the duty to be adequately attentive, nor the duty to proceed with caution necessarily requires a person to change his conduct if he already is being sufficiently cautious. To demonstrate this point by analogy, we draw upon *Allen v. Blanks*, 384 So.2d 63 (Miss.1980), an automobile accident case in which the allegedly intoxicated driver of a car hit a motorcyclist as the latter was passing through an intersection. The motorcyclist lost his negligence case at trial and made several claims on appeal, one of which was that the trial court erred in refusing to give the following requested instruction: "The driver of a motor vehicle has a lawful duty to decrease his speed upon approaching an intersection." *Id.* at 65 (internal quotation marks omitted). The Supreme Court of Mississippi determined that under the statutory scheme, the duty of care of a driver approaching a caution light was to "proceed ... only with caution." *Id.* (internal quotation marks omitted). The appellate court affirmed the trial court's refusal to give the requested instruction saying that "caution is a relative concept not necessarily entailing decrease in speed: The current speed may already be cautious speed." *Id.* Just as approaching an intersection created a more dangerous driving environment in *Allen*, the initial tear of the dura produced a more dangerous surgical environment in Dr. Pannu's case. In both cases, the surgeon and the driver had to proceed with caution. In both cases, there was a factual question as to whether the surgeon or driver needed to alter his/her conduct to satisfy the level of caution necessitated by the circumstances. Such a factual question is properly decided by the jury, in this case, aided with respect to the legal standard of care by the expert testimony of the board-certified neurosurgeons.

Thus, the trial court properly rejected the proposed language in the requested instruction directing the jury to find for appellants if Dr. Jacobson failed to "change" his conduct following the initial tear to the dura. Similarly, the final sentence of the proposed instruction—"as the danger increases, a reasonable doctor under the standard of care acts more carefully"—also may have wrongly implied that, under *any* circumstance, Dr. Jacobson had an affirmative duty to modify his behavior during the surgery.

■ There is a second consideration with respect to the proposed wording of the requested instruction. In any medical malpractice action, the applicable national standard of care comes from the testimony of expert witnesses, *see Pinder, supra*, 899 A.2d at 773, and it is up to the jury to determine credibility and which expert's testimony will be given the most weight, and to resolve conflicts in testimony, *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993) (citation omitted); *Streater v. United States*, 478 A.2d 1055, 1058 n. 4 (D.C.1984). If the trial court in this case had adopted appellants' proposed wording of the requested instruction, it may have confused the jurors as to whether they should credit or give more weight to appellants' or appellees' experts, or whether they were obligated to reject some of the testimony of appellees' expert witnesses.

Doctors Gruner and Marshall who testified for the appellants, and Doctors Shaffrey and Long who were witnesses for the

defense, all were board-certified, experienced neurosurgeons. Dr. Gruner testified that "the closer you get to the dura, the more careful you have to be and the more likely you are to have an injury.... " Dr. Marshall opined that the standard of care required Dr. Jacobson to maintain control of the drill "every second during the surgery," and that Dr. Jacobson did not do so because "the degree of movement of the drill ... [was] inconsistent with adequate control of the drill." Doctors Gruner and Marshall focused upon steps that Dr. Jacobson should have taken to protect the dura after the initial tear. Dr. Gruner asserted that Dr. Jacobson should have used a cottonoid or a piece of metal to protect the dura, or an assistant to help with the control of the drill. Dr. Marshall maintained that cotton, fiber, metal or plastic should be used to protect the dura. He also testified that the direction in which Dr. Jacobson drilled was inconsistent with the standard of care— that he should have drilled from medial to lateral (inside out). In contrast, appellees' experts (Drs. Shaffrey and Long) testified that Dr. Jacobson was not required by the standard of care to change his conduct or approach to the neurosurgery after the initial tear of the dura. Dr. Shaffrey stated that "You have to go in and assess the situation as you go," but that the standard of care did not require the use of any barrier to separate the drill from the dura and that he was "not aware of any standard for the direction that the drill should be used." Dr. Long stated that the initial tear of the dura "was not a violation of the standard of care," that "there was no single correct direction in which surgeons are required to move the drill under the standard of care," and that the use of a cottonoid was not required under the standard of care. Therefore, by stating that the national standard of care required Dr. Jacobson to "change his conduct according to

the danger," the proposed instruction appeared to favor the plaintiffs' expert testimony presented by Drs. Gruner and Marshall as to the national standard of care for a neurosurgeon under the circumstances, and risked undercutting the expert testimony given by Drs. Shaffrey and Long for the defense. If the jury had credited only appellees' experts, then the *Carney* rule on which the trial court declined to instruct the jury—that as the danger increases, so does the care which must be exercised— would be inapplicable, because Dr. Jacobson would already have been acting with the requisite quantum of care. The duty to proceed with caution does not impose an absolute duty to change one's conduct if he already is being sufficiently cautious. *See* RESTATEMENT (SECOND) OF TORTS § 298 Cmt. a (" 'care' denotes not only the attention which is necessary to perceive danger, but also the caution required to avert it once it is perceived"). Hence, the trial court was properly concerned that appellants' version of the instruction would have failed to fairly and accurately express the law. *Nelson, supra,* 694 A.2d at 901; *Waas, supra,* 648 A.2d at 184.

 Nevertheless, the fact that the proposed modified Instruction 5.3 as requested by appellants may have contained confusing and improper wording given the conflicting expert testimony did not permit the trial court to reject its contents *in toto,* because if the jury had elected to credit appellants' experts, then it was entirely proper that the jury hear the *Carney* rule. "[E]ven though a trial court is under no obligation to give any particular requested instruction, 'if the request directs the court's attention to a point upon which an instruction to the jury would be helpful, the court's error in failing to charge may not be excused by technical defects in the request.' " *Wilson v. Maritime Overseas Corp.,* 150 F.3d 1, 10 (1st Cir.1998) (quot-

ing 9A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2552 at 395–97 (1995 ed.)). Likewise, "the court must instruct the jury properly on the controlling issues in the case even though there has been no request for an instruction or the instructions are defective." *Management Sys. Assocs., Inc. v. McDonnell Douglas Corp.,* 762 F.2d 1161, 1177 (4th Cir.1985) (quoting 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2556, at 654–55 (1977 ed.)).[17] The purpose of these rules is plain: it is incumbent on the trial court to properly instruct the jury on the law. *Id.; see Waas, supra,* 648 A.2d at 183. Consequently, although "[i]t is not the duty of a trial judge to recast or modify an erroneous or misleading requested instruction," *Coleman v. Chudnow,* 35 A.2d 925, 926 (D.C.1944) (citation omitted); *see also Thoma v. Kettler Bros., Inc.,* 632 A.2d 725, 732 n. 2 (D.C.1993) (Sullivan, J., concurring) ("[T]he trial court was under no duty to recast, modify or otherwise correct the instruction."), the trial court must give the jury an accurate and fair statement of the law. The court may hear requests and arguments from the litigants, but ultimately, it is the court which bears the burdens of deciding which law to convey to the jury, and of formulating a neutral and objective manner in which to phrase the instructions. *See Waas, supra,* 648 A.2d at 183. Here, Dr. Pannu did not ask the trial court merely to "capture a kernel that may have some validity" ("a [trial] court is not required to rewrite an improper instruction to capture a kernel that may have some validity"), *McCann v. Wal-Mart Stores, Inc.,* 210 F.3d 51, 55 (1st Cir.2000) (citation omitted). Rather, part of the instruction he requested contained a fundamental legal principle to which this court has adhered at least since its 1969 decision in *Carney, supra*—"[t]he greater the danger, the greater the care which must be exercised." *Id.* at 403 (citation omitted). Significantly, *Morrison, supra,* also a medical malpractice case, cites both *Carney* and *Blumenthal, supra.* 407 A.2d at 560.[18]

We realize that the trial court was required to make a very difficult decision in the midst of this complex medical malpractice case by choosing one of several unattractive options: giving a possibly inaccurate and unfair instruction on the standard of care, giving no instruction at all on this important rule, or taking more time to figure out an accurate and fair instruction at the risk of frustrating jurors with additional and unwelcome waiting time while the judge and counsel conversed.[19] Nevertheless, the court bore the burden of tailoring the requested instruction (and the opposition thereto) to meet the demands of an accurate and fair statement of the law.

17. These are well-established concepts already adopted by virtually every federal circuit court. *E.g., Connecticut Mut. Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983); *Bueno v. Donna,* 714 F.2d 484, 490 (5th Cir. 1983); *Webster v. Edward D. Jones & Co.,* 197 F.3d 815, 820 (6th Cir.1999); *Davis v. Lane,* 814 F.2d 397, 401 (7th Cir.1987); *United States ex rel. Means v. Solem,* 646 F.2d 322, 328 (8th Cir.1980); *Chavez v. Sears, Roebuck & Co.,* 525 F.2d 827, 830 (10th Cir.1975).

18. *Smith v. Public Defender Serv. for the District of Columbia,* 686 A.2d 210 (D.C.1996), part of which involved a legal malpractice claim, contained a postscript written by the author of the opinion for the court which referenced both *Morrison* and *Blumenthal* with respect to the standard of care. *Id.* at 212–13.

19. A pre-trial status conference devoted to proposed jury instructions would help to avoid the need to address such issues in the midst of trial. Of course, if an issue concerning jury instructions arises during trial, it must be addressed at that time. However, a late afternoon, early evening, or early morning conference, when the jury is not in the court, would obviate waiting time for jurors.

We believe that a jury instruction along the following line would have adequately accounted for each party's legal theory of the case and would have ensured an accurate and fair statement of the law, contextualized all of the witnesses' testimonies, permitted the jury to make its own determinations of credibility, and allowed the jury to weigh the testimony:

Negligence is a relative concept. A reasonable doctor under the standard of care conforms his conduct according to the danger he knows, or should know, exists. Therefore, as the danger increases, a reasonable doctor under the standard of care acts in accordance with those circumstances.

The failure to give an instruction to this effect was an erroneous exercise of discretion. *See Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979). We hold that the error was not harmless and thus constituted an abuse of discretion. That is, we are unable to say with "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Nelson,* 694 A.2d at 902 (citing *R. & G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 539 (D.C.1991) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946))); *see Johnson, supra,* 398 A.2d at 366 ("If the error in the discretionary determination jeopardized the fairness of the proceeding as a whole, or if the error had a possibly substantial impact upon the outcome, the case should be reversed.") (citations omitted).

The concept which should have been conveyed in the omitted instruction was not present in any portion of the instructions which were given. Moreover, the jury heard conflicting facts and opinions as to whether Dr. Jacobson was negligent in severing the sacral nerves while performing the laminectomy. The court never told the jury that it could find for the appellants if it determined that Dr. Jacobson should have exercised greater care in drilling the lamina the closer he came to the exposed dura and the greater the danger the drill might slip and damage the nerves in the dural sac. We cannot say with "fair assurance" that the trial court's failure to give the above instruction did not substantially sway the judgment. *Nelson, supra,* 694 A.2d at 902.

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.

*So ordered.*

KRAMER, Associate Judge, dissenting:

The majority reverses the verdict for Dr. Jacobson, concluding that Judge Wright erred by not modifying a particular instruction requested by Dr. Pannu and by not giving that instruction to the jury. Since I conclude that Judge Wright's decision was correct; that the majority's modification would not have eliminated the potential for prejudice to Dr. Jacobson that could have resulted from giving the instruction; that, in any event, Dr. Pannu suffered no harm from the failure to give the instruction; and that the instructions given "as a whole, fairly and accurately state[d] the applicable law," *Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997) (quoting *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 625 (D.C.1986)) (internal quotation marks omitted), I must dissent. I also dissent from the majority's sweeping statements with respect to the obligations of trial judges with respect to jury instructions.

Dr. Pannu's argument for reversal of the judgment pertains solely to Judge Wright's decision not to give either Civil Jury Instruction 5–3 or a modified version

of that instruction tailored to the facts of this case. An understanding of Instruction 5–3 is useful to an understanding of the issues confronting us on this appeal. Instruction 5–3 reads:

> Negligence is a relative concept. A reasonable person changes [his] [her] conduct according to the circumstances or according to the danger that [he] [she] knows or should know, exists. Therefore, as the danger increases, a reasonable person acts in accordance with those circumstances. Similarly, as the danger increases, a reasonable person acts more carefully.

This concept was first articulated by our court in the case of *D.C. Transit Sys., Inc. v. Carney*, 254 A.2d 402 (D.C.1969).

As counsel for Dr. Jacobson correctly and successfully argued to Judge Wright, the *Carney* standard, incorporated into Instruction 5–3, is a "reasonable man" standard that the jurors are considered competent to determine for themselves, but it is inapposite in the context of medical malpractice where the performance of a doctor is evaluated by the jury based upon expert testimony from other doctors. Indeed, it is worth noting that the carefully crafted Standardized Civil Jury Instructions for medical malpractice cases do not include any instruction similar to Instruction 5–3. That instruction leaves completely unanswered how a jury should determine what heightened awareness should exist or what

greater measures should be taken when "the danger increases" during neurosurgery and leaves the jury to speculate about those issues. As Judge Wright pointed out, the jury is to decide "based upon what a reasonable neurosurgeon would be doing; not a reasonable person." [1] Thus, Judge Wright ruled that he would not give Instruction 5–3, but invited counsel to submit a version of Instruction 5–3 that was modified for a malpractice case.

The modified version of the instruction thereafter submitted on behalf of Dr. Pannu read:

> Negligence is a relative concept. A reasonable doctor under the standard of care changes [his] [her] conduct according to the circumstances or according to the danger [he] [she] knows, or should know, exists. Therefore, as the danger increases, a reasonable doctor under the standard of care acts in accordance with those circumstances. Similarly, as the danger increases, a reasonable doctor under the standard of care acts more carefully.

The majority concludes, and I agree, that Judge Wright did not err in refusing to give this instruction. The majority bases its conclusion on the idea that if Dr. Jacobson "had already been acting as carefully as required by the heightened danger even prior to the onset of that increased danger ... it would not be necessary for

---

**1.** It is also worth noting that during this discussion, Dr. Pannu's counsel expressed concern that the 9–series pertaining to instructions addressing medical malpractice did not define negligence. He was mistaken. Judge Wright instructed the jury that—

> a doctor is not negligent if he or she adheres to the standard of care in the field. You must decide whether the defendant failed to perform according to the professional standard of care. To make this decision, you must answer this question: Did the defendant do what a reasonable and

prudent professional in his or her field would have done under similar circumstances?

Judge Wright also gave Jury Instruction 9–6, which explains that if a "doctor's performance [fell] below the standard of care and thereby proximately caused the patient's injuries, then the doctor was negligent," and that "it is no defense to a charge of negligence that the doctor did the best that [he] could and that those efforts simply were unsuccessful."

[him] to act even *more* carefully following the initial tear of the dura, or to change his conduct." Thus, the majority recognizes, the proposed instruction would have misled the jury to believe that Dr. Jacobson "was obliged to affirmatively modify his actions subsequent to that incident."

Nonetheless, despite agreeing that neither Instruction 5–3 nor the version modified by Dr. Pannu's counsel was appropriate, the majority concludes that yet a third version of this instruction, which it has now formulated, should have been given in order to include the *Carney* concept that—

> the care required is always reasonable care ... [and] depends upon the dangerousness of the activity involved. The greater the danger, the greater the care which must be exercised.

*Carney, supra,* 254 A.2d at 403. Thus, the majority holds that the instruction that should have been given, even though never requested by Dr. Pannu, was the following:

> Negligence is a relative concept. A reasonable doctor under the standard of care *conforms* his conduct according to the danger he knows, or should know, exists. Therefore, as the danger increases, a reasonable doctor under the standard of care acts in accordance with those circumstances.

*Supra* (emphasis added). In my view, this instruction was not only unnecessary, but imports into the medical malpractice area a concept that has not heretofore been included, so far as I can find, for any professional negligence case in this jurisdiction. Any reaction to increased danger is for the medical community, not this court, to define as reasonable within the standard of care.

In support of its conclusion that Judge Wright erred by not giving an instruction essentially like this, the majority relies upon *Morrison v. MacNamara,* 407 A.2d 555 (D.C.1979). There, the issue was whether the defendant, a nationally certified medical laboratory, should be held to a national or to a local standard of care. But *Morrison* includes no discussion of the *Carney* rule—no mention of "changing" or "conforming" conduct according to the circumstances or because of increased danger. Rather, in a section relied upon by the majority entitled "General Principles," *Morrison* simply states:

> The elements which govern ordinary negligence actions are also applicable in actions for professional negligence. The plaintiff bears the burden of presenting evidence "which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." In negligence actions the standard of care by which the defendant's conduct is measured is often stated as "that degree of care which a reasonable prudent person would have exercised under the same or similar circumstances."

*Supra,* 407 A.2d at 560 (internal citations omitted).

Addressing medical malpractice specifically, *Morrison* noted that the "duty of care is generally formulated as that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances." 407 A.2d at 561. Thus, even in this context, there is no discussion of the concept that as the danger increases a reasonable doctor changes his conduct according to the circumstances or according to the danger that he knows or should know exists, nor of the concept that as the danger increases, a reasonable doctor acts more carefully. Indeed, a review of all of the cases citing *Carney*—and there are many—shows not one involving professional negligence of this type. Rather, the cases where increased danger has been discussed have

been primarily those addressing the duty of care owed by common carriers to passengers [2]—cases in which jurors are generally deemed competent to decide whether there has been a deviation from the standard of care without the assistance of expert testimony.

Moreover, instructions that tell jurors that there is an increased duty of care when there is increased danger have been criticized even in the context of general negligence cases that utilize no experts. As one authority has written:

> In the general negligence case, the defendant's obligation is to use the care of a reasonable person under the circumstances. The standard does not change even if the situation is fraught with danger. The circumstances clause allows for infinite flexibility, but the standard itself, which takes all those circumstances into account, remains the same. Put differently, the standard remains the same in all cases, but the safety-seeking conduct required by the standard will vary with the circumstances.

*See* 1 DAN B. DOBBS, LAW OF TORTS 302 (West Group 2001).

In addition, with respect to jury instructions that emphasize danger, Dobbs points out that these instructions unfairly emphasize the defendant's side of the case. *Id.* at 308. I am aware that this unfair emphasis on the defendant's position was a consideration taken into account by the majority that led it to modify the language from "changes conduct" to "conforming conduct." In the end, however, both formulations suggest to the jury that Dr. Jacobson should have modified his conduct. While "conform" is a slightly softer

word than "change," inherent in the concept of "conforming" is the idea of changing behavior. Thus, the unfair prejudice to Dr. Jacobson was not eliminated by the majority's formulation of this instruction. Indeed, the changes from Dr. Pannu's modified instruction to the instruction the majority finds acceptable seem *de minimus* and insufficient to support a conclusion that Judge Wright abused his discretion.

The theory of the case instruction that Judge Wright gave the jurors during the final instructions, to which there was no objection, set out precisely what the issues were that they needed to decide. Having completed the general instructions, he began the negligence portion of the instructions by informing them as follows with respect to Dr. Pannu's theory of the case:

> A lawsuit such as this for medical negligence is a claim against a doctor or other health care provider. The plaintiff, Doctor Pannu, claims that the defendant, Doctor Jacobson, failed to treat him with the same degree of skill, care or knowledge required of a doctor acting in the same or similar circumstances and that the defendant's failure was a proximate cause of injury to the plaintiff. Now, the plaintiff's *theory of this case* is that the defendant was negligent in performing the surgery on Doctor Pannu by failing to maintain complete control of the drill while he was drilling near the already exposed and torn dura and by failing to use adequate precautions to prevent injury to the nerves in that area.

(Emphasis added). These were precisely the issues before the jurors, and the jury's duty was to determine whose experts they

---

**2.** *See, e.g., Pazmino v. Washington Metro. Area Transit Auth.,* 638 A.2d 677, 679 (D.C.1994); *Sebastian v. District of Columbia,* 636 A.2d 958, 962 (D.C.1994). Indeed, many of those cases do not even mention the concept that "the greater the danger, the greater the care which must be exercised." *See, e.g., Washington Metro. Area Transit Auth. v. O'Neill,* 633 A.2d 834, 841 n. 13 (D.C.1993).

believed. Dr. Jacobson presented two experts who testified that his procedures were squarely within the standard of care. Thus, based upon the testimony from the experts he presented, there would have been no need for him to "change" or "conform" his conduct.

On the other hand, if the jury had accepted the testimony of Dr. Pannu's experts that Dr. Jacobson was negligent by not maintaining complete control of the drill while he was drilling near the already exposed dura and by failing to use adequate precautions to prevent injury to the nerves in that area, there again would have been no need for any form of the *Carney* instruction, since that would have amounted to a finding of negligence that would have resulted in a verdict for the plaintiffs. Because I conclude that the version of the rule formulated by the majority does not dispel the prejudice of suggesting that Dr. Jacobson was negligent in not "changing" or "conforming" his conduct, and that the instructions "as a whole, fairly and accurately state[d] the applicable law," *Nelson, supra,* 694 A.2d at 901, I cannot conclude that Judge Wright erred.

In any event, given the clarity with which Judge Wright instructed the jury, including on Dr. Pannu's theory of the case, I must conclude, contrary to the majority, that even if there was error, which I firmly believe there was not, the "judgment was not substantially swayed" by that error. *See id.* at 902.

I must also register my disagreement with the majority's formulation of the obligation of the trial judges with respect to instructions. The majority cites to the Fourth Circuit case of *Management Sys. Assocs., Inc. v. McDonnell Douglas Corp.,* 762 F.2d 1161, 1177 (4th Cir.1985), which quotes 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2556, at 654–55 (1977 ed.), for the proposition that "the court must instruct the jury properly on the controlling issues in the case even though there has been no request for an instruction or the instructions are defective." I fear this citation gives a dangerous misimpression that could mislead attorneys into believing that they had lesser obligations than they in fact have with respect to the proper formulation of jury instructions. Whatever may be the practice in the Fourth Circuit, the Superior Court Rules, particularly with respect to civil cases, make it crystal clear that attorneys neglect to focus on jury instructions at their peril. The obligations to assist the judge with civil jury instructions begins with the pretrial statement. Superior Court Civil Rule 16(e), unlike its federal counterpart, requires that the joint pretrial statement filed by the parties before the pretrial conference include a list of both the Standardized Civil Jury Instructions, by number, and "the complete text of any jury instruction not found" in the Standardized instructions that the parties wish to have given. Moreover, Superior Court Civil Rule 51 gives the parties additional opportunities to file written requests with the court and bars a party from assigning error for the court's giving or failing to give an instruction unless that party objects before the jury retires to consider its verdict.[3] Thus, the idea that the predominant burden for correct jury instructions lies heavily on the shoulders of judges and lightly on the shoulders of attorneys misconstrues the co-operative relationship anticipated by our civil rules.

---

**3.** *See also* Super. Ct. Crim. R. 52(b) (providing that the "plain error" standard applies to error or defects in the proceedings that have not been brought to the attention of the court, a provision with necessarily includes the instructions given to juries).