Maurice NACCACHE, M.D., Appellant

v.

Angela M. TAYLOR, Appellee.

No. 11–CV–0392.

District of Columbia Court of Appeals.

Argued Nov. 15, 2012.

Decided July 25, 2013.

 

Carl J. Schifferle, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellant.

Keith W. Donahoe, with whom Frank R. Kearney was on the brief, for appellee.

Before BLACKBURNE–RIGSBY and EASTERLY, Associate Judges, and REID, Senior Judge.

EASTERLY, Associate Judge:

Dr. Maurice Naccache appeals from a $6.5 million medical malpractice judgment. Angela M. Taylor sued him for his failure, while working at a public medical clinic, to give her adequate prenatal care that resulted in the premature birth and permanent severe disability of her son, Timothy Taylor. On appeal from a case that was litigated over the course of three years and culminated in a one-week jury trial, Dr. Naccache argues that the trial court made five errors, each of which require reversal. Specifically, he asserts that the trial court: (1) should have determined that Ms. Taylor's negligence claim on Timothy's behalf was barred by the equitable defense of laches; (2) should not have allowed Ms. Taylor to ask the jury to infer that Dr. Naccache never saw a lab report, based on that report's absence from the records available at trial; (3) should not have allowed Ms. Taylor to present a new negligence theory mid-trial; (4) should not have instructed the jury at the close of trial that Dr. Naccache was subject to a heightened duty of care; and (5) should have granted Dr. Naccache's motion for new trial because the combination of these errors resulted in a miscarriage of justice and because the jury's verdict was against the clear weight of the evidence. We affirm.

## I. Facts

Ms. Taylor was twenty-seven to twenty-eight weeks pregnant with Timothy when she first visited the Anacostia Neighborhood Health Center, a public health clinic administered by the District of Columbia, for prenatal care on March 5, 1987. Dr. Naccache, an obstetrician at the clinic, saw Ms. Taylor and ordered both a urinalysis and a urine culture, routine tests administered to all pregnant patients of the clinic, to screen for asymptomatic bacteria ("ASB"). The urinalysis was run four days later, on March 9, and registered a $2+$ on a four-point scale.[1] Despite reviewing the urinalysis results, Dr. Naccache did not contact Ms. Taylor or put her on any medication.

Approximately four weeks later, on April 2, Ms. Taylor visited the clinic again. During this visit, Dr. Naccache noticed that the clinic had yet to receive the urine culture lab report, which normally would have taken three to five days to complete. Dr. Naccache asked a nurse to check for the missing report but still did not inform Ms. Taylor of the urinalysis results or put

---

1. Healthy, bacteria-free urine rates 0 on the scale and is considered normal, whereas a 4 suggests an abnormally high amount of bacteria and a serious health issue.

her on any medication. In addition, Dr. Naccache did not order further tests or another lab culture. Dr. Naccache scheduled another appointment with Ms. Taylor two weeks later.

Before the date of her next appointment arrived, however, Ms. Taylor, now thirty-two to thirty-three weeks pregnant, developed severe cramping and began having contractions. When she went to the emergency room, she discovered that she was in labor. In addition, she had high levels of bacteria, protein, and blood in her urine, and her white-blood-cell count was abnormally high. The next day, Timothy was born prematurely. Shortly following his birth, Timothy suffered severe problems, including infection, seizures, oxygen deprivation, underdeveloped lungs, brain hemorrhaging, and brain damage. At around one year of age, Timothy developed cerebral palsy. Currently, Timothy has an IQ of 41, limiting his language and fine motor skills such that "there is nothing that he does that would be outside the range of a normal 6 month old." He is unable to sit up, stand, walk, or feed himself.

In 1990, Ms. Taylor authorized her attorney at the time to request a set of medical records from the clinic, and the firm did so. Although counsel received a set of records, the records were never certified as complete and did not contain a copy of the urine culture lab report. In late 2007, Ms. Taylor began the instant litigation on Timothy's behalf by filing a complaint that alleged, *inter alia*, that Dr. Naccache had failed to assess, diagnose, and treat Ms. Taylor's ASB, causing Timothy's severe brain damage and cerebral palsy. After a prolonged discovery period and several rounds of pretrial motions, the trial began in October 2010. At trial, Dr. Naccache pursued several lines of defense, namely, that he gave Ms. Taylor the type

of care that was required, that Timothy's problems were not the result of any negligence on Dr. Naccache's part, and that Ms. Taylor waited too long to bring the claim. The jury sided with Ms. Taylor, returning a verdict for $6.5 million, and the trial court denied Dr. Naccache's motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. This appeal followed.

## II. Laches

■ The complaint in this case was filed nearly twenty years after Dr. Naccache saw Ms. Taylor as a patient. But because Timothy was both a minor and *non compos mentis*, it was timely filed under two provisions of the D.C.Code that establish and toll the District's statute of limitations. *See* D.C.Code §§ 12–301, –302 (2001 & Supp.2012) (tolling the statute for a minor until he becomes an adult and indefinitely for someone who is *non compos mentis*). In a pretrial motion, Dr. Naccache argued that Ms. Taylor's suit should be barred by the equitable defense of laches because the nearly twenty-year delay in bringing suit unfairly prejudiced him. The trial court rejected this argument, reasoning that laches was unavailable to actions at law. On appeal, Dr. Naccache argues that the trial court's ruling was incorrect and that we should remand to permit him to put on evidence showing that he had a winning laches defense. We review *de novo* the trial court's decision to reject Dr. Naccache's laches defense. *See Technical Land, Inc. v. Firemen's Ins. Co.*, 756 A.2d 439, 443 (D.C. 2000). Applying that standard, we hold that the defense of laches does not apply to purely legal claims.

To assess the availability of laches as a defense to Dr. Naccache, we must first review some legal history. The American civil law system originally provided two means to resolve civil disputes: courts of

law and courts of equity.[2] Equity courts were intended to provide relief to individuals who had no remedies at law.[3] Both court systems contained mechanisms for dealing with stale claims. In actions at law, a statute of limitations held the door open for litigants for a period of time predetermined by the legislature; within that period of time, any delay by the plaintiff in bringing a given case was immaterial.[4] In actions at equity, the defense of laches was available, requiring a fact-intensive, case-by-case prejudice analysis that focused on the circumstances and actions of the particular parties.[5] Whereas the application of a statute of limitations was rigid, calculated, and indiscriminate if the predetermined time period had tolled, laches was more free-form. A defendant could prevail if she could show on a particular set of facts that the plaintiff's delay was unreasonable and that the delay worked to the defendant's detriment.[6]

In this era of dual civil justice systems, laches was viewed as a defense exclusive to claims at equity. Thus in *Barbour v. Moore*, 10 App.D.C. 30 (D.C.Cir.1897), the Court of Appeals of the District of Columbia, the precursor to the present-day United States Court of Appeals for the District of Columbia Circuit, noted that the case before it was not "a suit in equity ... in

which laches ... is sometimes a bar to all relief[,] but an action at law in which lapse of time, short of the period of limitations, is of no avail as a defence." *Id.* at 47–48. The court reaffirmed this proposition in *Roller v. Clark*, 38 App.D.C. 260 (D.C.Cir. 1912), stating that "[l]aches, though a good defense in equity, is no defense at law." *Id.* at 266.

With a few exceptions, the division between courts of law and equity has not survived in the modern era. With the adoption in 1938 of the Federal Rules of Civil Procedure, and specifically Rule 2, the federal courts created a single "civil action" by merging law and equity.[7] A number of state courts had already merged their systems by this time and a great many more did so after. The District followed suit when it established its current court system in 1970, and adopted rules of civil procedure in large part, "derived directly from the ... Federal Rules." *See* District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (codified as amended at D.C.Code §§ 11–101 to – 2504 (2001 & Supp.2012)); *see also* Super. Ct. Civ. R. (introductory note); Super. Ct. Civ. R. 2 (creating one "civil action,"

---

2. *See* 1 James Wm. Moore et al., Moore's Federal Practice ¶ 2.02[1] (3d ed. 2012); Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. Pa. L.Rev. 909, 914 (1987).

3. *See* Moore, *supra* note 2.

4. *Cf., e.g., Moran v. Harrison*, 91 F.2d 310, 313 (D.C.Cir.1937) ("If by the law of the state which has created a right of action, it is made a condition of the right that it shall expire after a certain period of limitation has elapsed, no action begun after the period has elapsed can be maintained in any jurisdiction.").

5. *See Abraham v. Ordway*, 158 U.S. 416, 420, 15 S.Ct. 894, 39 L.Ed. 1036 (1895) ("[E]quity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done, in the particular case, by granting the relief asked. It will, in such cases, decline to extricate the plaintiff from the position in which he has inexcusably placed himself....").

6. *See Abraham*, 158 U.S. at 420, 15 S.Ct. 894; *Major v. Shaver*, 187 F.2d 211, 212 (D.C.Cir. 1951).

7. *See* Moore, *supra* note 2, at ¶ 2.02[2][a].

officially merging law and equity in the District).

Notwithstanding this merger here and elsewhere, the distinction between law and equity was not completely erased. For example, because the Seventh Amendment's "right of trial by jury" extends only to "Suits at common law," the distinction is still used to define the breadth of that right. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470–72, 477–79, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).[8] Since merger, courts have had to determine whether specific distinctions between law and equity are part of the old formalism, which the merger purported to discard, or a substantive difference in approach that remains a relevant division. One question that has been considered post-merger in a number of jurisdictions, but never squarely in the District, is whether laches may cut off actions at law that are authorized under a statute of limitations.

The overwhelming majority of the state supreme courts we identified that have considered this issue continue, post-merger, to bar laches as a defense for actions at law.[9] We identified only three states that, post-merger, allow laches to be raised as a defense in actions at law. Of those three, one does so only in a very circumscribed area of the law, which is inapplicable here.[10] This leaves only two states—Kansas and South Dakota—whose highest courts have explicitly held post-merger that laches is available to all actions at law.[11]

Like the majority of state courts that have considered the issue, the District of Columbia federal courts, post-merger, also do not permit laches to be raised as a

**8.** *See also* Moore, *supra* note 2, at ¶ 2.02[3][b] (noting areas of federal law where the distinction, post-merger, remains important).

**9.** *See, e.g., Elliott v. Navistar, Inc.*, 65 So.3d 379, 386–87 (Ala.2010); *Laverty v. Alaska R.R. Corp.*, 13 P.3d 725, 730 (Alaska 2000); *Warford v. Union Bank of Benton*, 2010 Ark. App. 635, 378 S.W.3d 239, 242–43 (2010); *Mandracio v. Bartenders Union, Local 41*, 41 Cal.2d 81, 256 P.2d 927, 929–30 (1953); *A. Sangivanni & Sons v. F.M. Floryan & Co.*, 158 Conn. 467, 262 A.2d 159, 164 (1969); *Jones v. Douglas Cnty.*, 262 Ga. 317, 418 S.E.2d 19, 22–23 (1992); *Sundance Homes, Inc. v. Cnty. of DuPage*, 195 Ill.2d 257, 253 Ill.Dec. 806, 746 N.E.2d 254, 263 (2001); *Town of New Chicago v. City of Lake Station*, 939 N.E.2d 638, 652–53 (Ind.App.2010); *Plaza Condo. Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54–55 (Ky.1996); *Strickland v. Cousens Realty, Inc.*, 484 A.2d 1006, 1008 (Me.1984); *M.A.D. v. P.R.*, 277 N.W.2d 27, 29–30 (Minn. 1979); *Miss. Dep't of Human Servs. v. Molden*, 644 So.2d 1230, 1232–33 (Miss.1994); *UAW–CIO Local No. 31 Credit Union v. Royal Ins. Co.*, 594 S.W.2d 276, 281 (Mo.1980) (en banc); *Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14, 18–19 (1985); *Corvallis Sand & Gravel Co. v. State Land Bd.*, 250 Or. 319, 439 P.2d 575, 577–78 (1968) (en banc); *Jonklaas v. Silverman*, 117 R.I. 691, 370 A.2d 1277, 1280 (1977); *DOIT, Inc. v. Touche, Ross, & Co.*, 926 P.2d 835, 845–46 (Utah 1996); *Hammond v. Hammond*, 14 P.3d 199, 202 (Wyo.2000).

The Court of Appeals of Maryland, which we "accord[ ] the most respectful consideration" because our common law is derived from Maryland law, *Mims v. Mims*, 635 A.2d 320, 325 n. 12 (D.C.1993), is one court that has not yet considered this issue post-merger. We note, however, that it continues to favorably cite pre-merger case law characterizing laches as a "defense in equity." *See Ross v. State Bd. of Elections*, 387 Md. 649, 876 A.2d 692, 703 (2005).

**10.** The Arizona Supreme Court recognizes laches an equitable doctrine generally only applicable to suits at equity but has allowed laches to be raised as a defense to legal claims regarding elections. *See Harris v. Purcell*, 193 Ariz. 409, 973 P.2d 1166, 1167 n. 2, 1169 (1998).

**11.** *See McDaniel v. Messerschmidt*, 191 Kan. 461, 382 P.2d 304, 307 (1963); *Kenny v. McKenzie*, 25 S.D. 485, 127 N.W. 597, 601–02 (1910).

defense to claims at law.[12] In *Saffron v. Department of the Navy*, the D.C. Circuit explained that laches is "peculiarly a creature of equity," applicable only to cases that are "purely equitable in character." 561 F.2d 938, 941 (D.C.Cir.1977); *see also Farouki v. Petra Int'l Banking Corp.*, 811 F.Supp.2d 388, 405 (D.D.C.2011) (noting that it is well settled that laches is a defense at equity), *vacated on other grounds*, 705 F.3d 515 (D.C.Cir.2013); *Potts v. Howard Univ. Hosp.*, 623 F.Supp.2d 68, 73 n. 3 (D.D.C.2009) (noting that laches is unavailable in any case that is governed by "a congressionally mandated statute of limitations").

The District of Columbia federal district court appears to be under the impression that it is already the law in the District of Columbia that laches is not a defense to actions of law. *See Johns v. Rozet*, 141 F.R.D. 211, 220 (D.D.C.1992) (noting that "under District of Columbia law," "the de-

fense of laches is a defense in equity, rather than in law") (citing *Schmittinger v. Schmittinger*, 404 A.2d 967, 970 (D.C. 1979)). Certainly there is no case law to the contrary. Although they were decided pre-merger, *Barbour*, 10 App.D.C. at 47–48, and *Roller*, 38 App.D.C. at 266, have never been called into question and are still good law. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). And, post-merger, this court has continued to identify laches as an exclusively equitable defense. We have never upheld the defense of laches to cut off actions at law for money damages.[13]

Even if we were to come to this issue on a clean slate, we see little to gain and much to lose by applying the equitable defense of laches to cut off claims at law. As noted above, such claims are already governed by statutes of limitations that have been decided upon by the legislature. "An express limitations period 'reflects a

**12.** Although the D.C. Circuit has endorsed the majority rule in state courts, the circuits are split. *Compare Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir. 2001) (noting in federal copyright suit that laches is not a defense to actions at law), *and Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259–60 (2d Cir.1997) (noting same in federal civil rights suit), *with Chirco v. Crosswinds Cmties., Inc.*, 474 F.3d 227, 234 (6th Cir.2007) (noting in federal copyright suit that laches can apply equally to claims at law and equity), *and Teamsters & Emp'rs Welfare Trust of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881 (7th Cir.2002) (noting same in ERISA suit). Dr. Naccache urges us to follow the Federal Circuit's decision in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed.Cir.1992). But we read *Aukerman's* holding as strictly circumscribed to patent litigation. *See id.* at 1029 (describing laches within the larger scheme of patent laws recodified in 1952).

The Supreme Court has not revisited this question in its post-merger jurisprudence. As the Second Circuit pointed out in *Ivani Contracting*, however, the Court has observed,

albeit in dicta, that the " 'application of the equitable defense of laches in an action at law would be novel indeed.' " *Ivani Contracting*, 103 F.3d at 259–60 (quoting *Oneida Cnty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 244–45 n. 16, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985)).

**13.** Dr. Naccache cites cases that analyze actions at equity or mixed actions at equity and law, but the nature of the relief sought distinguishes these cases. *Cf. In re Johnson*, 820 A.2d 535, 538–39 (D.C.2003) (noting that the relief sought, *inter alia*, determines if the action is one at law or equity). In particular, Dr. Naccache's attempt to harness our arrearages line of cases—where laches is available— is unavailing. We have held that arrearages pursuant to both divorce and consent-decree proceedings may convert into money judgments that can subsequently be collected. *Padgett v. Padgett*, 472 A.2d 849, 851–52 (D.C. 1984) (consent decrees); *Brandt v. Brandt*, 276 F.2d 488, 490 (D.C.Cir.1960) (divorce decrees). However, those claims are simply not "strictly legal" as Dr. Naccache suggests, and our holding here should not be read to disturb *Padgett*, *Brandt*, or their progeny.

legislative value judgment' striking the appropriate balance between the interests promoted by the statute and countervailing interests of repose." *Ivani Contracting*, 103 F.3d at 260 (brackets and internal quotation marks removed) (quoting *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 169–70 (8th Cir.1995) (en banc), *abrogated on other grounds by Madison v. IBP, Inc.*, 330 F.3d 1051, 1056–57 (8th Cir.2003)). The legislature determines " 'the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.' " *Boyle's Famous Corned Beef Co.*, 66 F.3d at 169 (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463–64, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). In some special cases, as here, the legislature has decided, based on fairness concerns, that a plaintiff may have an additional or indefinite amount of time to file suit.[14] *See McCracken v. Walls–Kaufman*, 717 A.2d 346, 354 (D.C.1998) (noting that the tolling of statute of limitations should occur when an individual is " 'unable to manage his business affairs or estate, or to comprehend his legal rights or liabilities' " (quoting *Speiser v. U.S. Dep't of Health & Human Servs.*, 670 F.Supp. 380, 384 (D.D.C.1986))).

To import laches as a defense to actions at law would pit the legislative value judgment embodied in a statute of limitations (or, as here, its exceptions) against the equitable determinations of individual judges. Judges could disallow claims that the legislature had already determined were timely brought.[15] Yet "[m]odern statutes of limitations ... embody the notion that fixing the periods for bringing damages actions is a *legislative* function." *See Ivani Contracting*, 103 F.3d at 259 (emphasis added). Thus, to import laches as a defense to actions of law would alter the balance of power between legislatures and courts regarding the timeliness of claims. We are understandably reluctant to make this change.

Dr. Naccache's argument that "sound policy considerations ... support the availability of laches" in actions of law fails to explain why laches is necessary as an additional time-bar doctrine in a system that already uses a statute of limitations. Moreover, we think it would be ill-advised to inject the uncertainty that would inevitably accompany the recognition of a defense of laches for claims at law. The benefit of statutes of limitation is that they are not discretionary or applied case-by-case. *See, e.g.,* D.C.Code § 12–301 (Supp. 2012). They give litigants clear and predictable guideposts. *See Ivani Contracting*, 103 F.3d at 259 (noting that statutes

---

**14.** Dr. Naccache objects that a defense of laches is needed in actions at law because, in cases like this one, "no statute of limitations will ever run." But that is the exact legislative value judgment reflected in the statutory exception. Even so, plaintiffs who are not subject to any limitations period still have a number of practical incentives not to delay in filing suit, for example, the need for the money they could receive in a judgment and the concerns about the preservation of evidence and the continued availability of witnesses. Moreover, plaintiffs not subject to a limitations requirement still have to overcome procedural hurdles, such as stating a cognizable claim and demonstrating that there are mate-

rial issues of fact to survive summary judgment. Finally, plaintiffs exempt from a statute of limitations may have to defend against a constructive delay argument at trial (as Ms. Taylor did in this case).

**15.** Dr. Naccache suggests that we fold laches into a group of equitable doctrines that have been allowed in actions at law, but we see laches as a distinct doctrine that has developed separately post-merger. Indeed, unlike laches, some of those doctrines, like tolling, have long applied to actions at law. *See, e.g., P.H. Sheehy Co. v. E. Importing & Mfg. Co.*, 44 App.D.C. 107, 111 (1915).

of limitation "impose[ ] certainty and predictability upon how long a defendant should be subject to suit"). Allowing laches to apply in a system that is already governed by statutes of limitations would undo these benefits. The equities of any claim could at least be subject to question. Litigants would have no certainty one way or another, and courts would inevitably be flooded with requests to assess a defense of laches in every civil case.

Based on the persuasive case law from around the country, our precedent, and the separation of powers and administrative concerns detailed above, we conclude that the line between legal and equitable claims vis-à-vis laches is still sound, and we decline to disturb it. In cases at law, where the legislature has determined through a statute of limitations that the door for bringing suit should remain open for a predetermined period of time, it should not be left to a judge's discretion to close that door early.

### III. The Missing Urine Culture Lab Report

■ Ms. Taylor's medical records from the clinic were obviously a central component of this case. However, because Ms. Taylor's original clinic file had been destroyed pursuant to District policy several years before the trial began, the only copy that existed at the time of trial was one that Ms. Taylor's previous law firm requested from the clinic in 1990. That file did not contain a lab report of the urine culture that Dr. Naccache ordered on March 5, 1987. Both before and at trial, Dr. Naccache repeatedly raised concerns about Ms. Taylor using the fact that the urine culture lab report was not in the medical records obtained in 1990 to establish that Dr. Naccache had not reviewed the lab report in 1987. On appeal, Dr. Naccache argues that his concerns were disregarded by the trial court, that Ms.

Taylor's attorneys repeatedly invited the jury to draw the improper adverse inference that the incomplete medical records demonstrated that the urine culture lab report never existed, and that an instruction to the jury at the close of trial was inadequate to cure the prejudice to Dr. Naccache.

■ Trial judges are entrusted with considerable discretion when ruling on both the admission and use of evidence at trial. *See Campbell–Crane & Assocs., Inc. v. Stamenkovic,* 44 A.3d 924, 941 (D.C. 2012). We review for abuse of that discretion and discern none. The fundamental problem with Dr. Naccache's argument is that it bears no relationship to the record. Ms. Taylor's attorneys never invited the jury to draw the impermissible adverse inference about which Dr. Naccache complains. Instead, Ms. Taylor's counsel relied on the notations in the available records and on Dr. Naccache's own admission at trial that he never saw the lab report. Moreover, to the extent the jury's attention was drawn to the absence of the urine culture lab report from the medical records admitted at trial, that was done by Dr. Naccache's attorneys. Nevertheless, the trial court consistently protected Dr. Naccache before, during, and at the end of trial from any adverse inference that the lab report's absence from the medical records could serve as a basis to conclude that Dr. Naccache never saw it. Based on this record, we conclude that Ms. Taylor's use of her medical records at trial provides no basis for reversal.

Before trial, Dr. Naccache filed a motion *in limine* asking the court to preclude Ms. Taylor from putting on any testimony regarding the absence of the urine culture lab report from Ms. Taylor's medical records. At the motions hearing, Dr. Naccache's attorney argued that the medical

records were "ramshackle" and that any argument that Dr. Naccache had never reviewed the lab report based on its absence from the file would be an unfair adverse inference; the only definitive proof of that assertion would have been the original file, which *no longer existed.*[16] Ms. Taylor's attorney responded that this was a nonissue and that he would not have to invite the jury to draw any adverse inferences based on the absence of the lab report from Ms. Taylor's medical records because he had affirmative evidence that Dr. Naccache had never seen the lab report, including (1) a notation in Ms. Taylor's medical chart from her second visit to the clinic that said "check other lab slips," indicating that Dr. Naccache had not seen the lab report at that time; (2) the lack of any reference in Dr. Naccache's notes to the lab report; and (3) the testimony from a clinic nurse that Dr. Naccache told her to look for the lab report. Counsel for Ms. Taylor also noted that he planned to argue to the jury that the three-week delay in looking for the report was itself negligent given Ms. Taylor's 2+ urinalysis result and the normal five-day-return rate on urine culture results.

After hearing argument from counsel, the trial court ruled that Ms. Taylor's medical records could come into evidence but that their use would be cabined in several ways. Specifically, the court ruled that Ms. Taylor's attorneys could not argue that the records were complete or that the absence of the urine culture lab report from the records supported the theory that Dr. Naccache never reviewed it. The court also stated that it would give the jury a limiting instruction when Ms. Taylor's medical file was introduced into evidence.

Consistent with Ms. Taylor's representations at the pretrial hearing, the fact that the urine culture lab report was missing from her medical records in 1987 was not Ms. Taylor's theory of the case. Ms. Taylor's counsel opened on the theory of the case he had presented to the court pretrial, and he made no reference to the absence of the lab report in the copy of the medical records. Instead, Dr. Naccache's counsel brought up the absence of the lab report; in Dr. Naccache's opening, counsel noted that the lab report was missing from Ms. Taylor's medical records and that "that test is not part of the record now." [17]

Thereafter, counsel for Ms. Taylor did not focus on the absence of the urine culture report in his examination of witnesses. He did not need to. Having called Dr. Naccache to the stand as Ms. Taylor's first witness, counsel for Ms. Taylor elicited an admission from Dr. Naccache that he never saw the lab report:

[Dr. Naccache]: Now, this lab slip is missing. I didn't see it and it could have been filed. *I'm not saying that I did see it, I'm saying I didn't see it.* But it could have been filed, could have been filed.

So I don't know if it's filed, it's missing. I don't know what happened to the lab slip. But if it's positive, I would have been right away on top of it if it

---

16. Dr. Naccache's attorney also argued that certification was a prerequisite for admission and because the medical records had not been certified as complete, they should be excluded at trial. On appeal, Dr. Naccache concedes that the medical records were "admissible for what they contained."

17. Even before opening statements, the court had made sure the jury was aware that Ms. Taylor's original medical records were unavailable. The court informed the jury that, pursuant to a District statute that allowed records to be destroyed after ten years, the original records had been destroyed, and that the jury therefore would not have access to them.

was—if I saw it and it was positive. I don't say I see—I saw it. I did not.

Q: Okay. So are we fair, Doctor, even as of today, you have not seen the culture report you ordered; is that fair?

[Dr. Naccache]: *Correct. I didn't see it.*

(Emphasis added.)

Even though it had not been a focus of the plaintiff's case, Dr. Naccache's attorneys renewed their concerns that counsel for Ms. Taylor was inviting the jury to infer that Dr. Naccache had not seen the lab report in 1987 based on its absence from the medical records when Dr. Phillips, one of Ms. Taylor's medical experts, was called to testify the next day about the standard of care that Dr. Naccache owed to Ms. Taylor. Again, counsel for Ms. Taylor avoided the issue of the completeness of Ms. Taylor's medical records, and instead asked Dr. Phillips hypotheticals based on Dr. Naccache's admission the day prior. Thus counsel for Ms. Taylor asked:

Q. Doctor, I'm going to give you a hypothetical.

I want you to assume that Dr. Naccache testified yesterday before this jury that he has yet—even as of today, he has never seen that culture report. Okay?

Assuming that to be true, do you have an opinion to a reasonable degree of medical certainty as to whether he breached the standard of care in 1987?

In a subsequent bench conference to address Dr. Naccache's repeated objections, the trial court correctly noted that Dr. Phillips' testimony was based on these hypotheticals as well as evidence in the record, *not* on the absence of the report in the medical records. When Dr. Naccache argued that "The—the effect is that [Dr. Phillips] is—he is arguing from the fact that the record is not here as to its contents [*i.e.* that the lab report was positive]," the court responded, "I—I think not. *That's exactly the opposite of what he's doing.*" (Emphasis added.)

Nor did counsel for Ms. Taylor seek to establish the completeness of Ms. Taylor's medical records or highlight the absence of the lab report therefrom the following day when they presented testimony from Sandra Robinson, a records custodian at the law firm that represented Ms. Taylor in 1990, when she requested her medical records from the Anacostia clinic, and Phillip Husband, the Deputy General Counsel for the District of Columbia Department of Health. On direct examination, Ms. Robinson simply testified that she followed normal procedures to obtain Ms. Taylor's medical records in 1990, and she verified that the medical records before the court were the same she had received at that time. Ms. Taylor's attorney never asked Ms. Robinson if the medical records were complete and she never represented that they were.[18] In his direct examination,

18. This, however, was the focus of Dr. Naccache's attorney's cross-examination of Ms. Robinson. In particular, Dr. Naccache's attorney inquired of Ms. Robinson if she had ever "ask[ed] for a copy of a record from a hospital and g[otten] back an incomplete copy?" Ms. Robinson responded that, in this case:

[W]e requested a complete set of the records. What we have maintained in our file is what we received from the Anacostia clinic and it's the way we have always done

business. And we never, quite frankly, just to talk about the certified copies, ask for a certified copy. We get the records from the facility and this is what we got from the Anacostia clinic.

On appeal, Dr. Naccache points to this testimony as evidence that Ms. Taylor put on testimony that her medical records were complete. First, Dr. Naccache cannot argue on appeal that this witness was improperly directed to testify about the completeness of Ms. Taylor's medical records when his own trial

Mr. Husband testified about his unsuccessful search for all medical records relating to Ms. Taylor's care at the clinic, her subsequent illness and delivery of Timothy at the hospital, and Timothy's care after he was born. Mr. Husband had been unable to find the clinic files and surmised that they were destroyed in the year 2000 when employees of D.C. General Hospital made a general purge.

At the close of trial, and again at Dr. Naccache's request, the trial court gave the following limiting instruction to the jury:

> Ladies and gentlemen, you just heard from the last couple of witnesses a lot of testimony about the records from the Anacostia clinic and the court has admitted these records as properly authenticated. The court is not and cannot in any way certif[y] that they are the complete records.

Finally, Ms. Taylor did not urge the jury to use her medical records for an impermissible purpose in closing. Rather, in support of the argument that Dr. Naccache was negligent because he failed to obtain or review the urine culture lab report, Ms. Taylor's counsel repeatedly pointed to the actual evidence in the record: testimony from the clinic nurse that the lab report was missing, Dr. Naccache's admission on the stand that he never saw the lab report, Dr. Naccache's notation on medical records that he did not see the lab report, and evidence that he never attempted to track down the report himself.[19]

Even though counsel for Ms. Taylor never made the argument, the trial court instructed the jury at the close of trial that they could not draw an adverse inference based upon the lab report's absence from the medical file admitted into evidence at trial: "You are instructed that you may not conclude that Dr. Naccache failed to obtain the results of Angela Taylor's urine culture based on the test result's absence from the available medical records."

On this record and contrary to Dr. Naccache's characterization, we can find no evidence that Ms. Taylor's attorneys ever elicited testimony or sought to argue that an impermissible adverse inference could be drawn that Dr. Naccache never saw the urine culture lab report because it was not in the copy of Ms. Taylor's medical records introduced at trial. Moreover we determine that the measures taken by the court to prevent the jury's misuse of the medical records were entirely adequate.

## IV. The "Surprise" Theory of Liability

▬ Dr. Naccache also argues that Ms. Taylor unfairly pursued a "new" theory of liability during the trial, which he argues "incurably prejudiced the entire defense on liability." According to Dr. Naccache, the pretrial theory of liability of which he had notice was that his treatment of Ms.

---

counsel posed the question. Further, even in response to that question, Ms. Robinson did not testify that Ms. Taylor's medical records were complete, but rather that it was Ms. Robinson's practice to request a complete copy.

19. Counsel argued that it was reasonable to infer *"from all the evidence"* that the urine culture lab report had been lost and never made it into the file. Counsel argued that the jury

can't hold [Dr. Naccache] responsible for a lost culture. What you can hold him responsible for, though, is failing to respond, failing to follow up, failing to see this and do something about it, failing to get the result. In his own words, [Dr. Naccache] never saw it. Dr. Manning told you, [Dr. Naccache] breached the standard of care. You order a test, you get the result.

Taylor fell below the appropriate standard of care because he failed to prescribe her an antibiotic tailored to the type of bacteria that the urine culture lab report would have identified (for example, *E. coli* ). Dr. Naccache argues that at trial Ms. Taylor presented expert testimony in support of a different theory, namely, that Dr. Naccache's treatment fell below the standard of care because, based on Ms. Taylor's earlier urinalysis results (which indicated she had an infection but did not specify the type of bacteria causing the infection), Dr. Naccache failed to prescribe a broad-spectrum antibiotic. Dr. Naccache contends that this "new" theory prejudiced him because he had not prepared for it.

▇▇▇ We review the trial court's allowance of this expert testimony for abuse of discretion, *see Weiner v. Kneller,* 557 A.2d 1306, 1311–12 (D.C.1989); again, we see none on this record.[20] As this court explained in *Weiner,* "[w]here the issue is whether an expected witness should be permitted to give putatively unexpected testimony, a threshold question is whether the contested testimony was indeed distinct from the theory generally articulated by the witness." *Id.* at 1310. We further noted that "it would be imposing too great a burden to require a party to describe, in a Rule 26(b)(4) statement, every possible direction his expert's testimony could take" and that "[c]ourts have generally allowed experts to state the natural concomitants of their arguments, including rebuttals of contrary expert testimony, when they have been satisfied that such testimo-

ny was of a piece with the original theory." *Id.* Likewise, in order to show that a plaintiff introduced a new theory of liability mid-trial, a threshold question is whether the theory of liability during trial was distinct from the pretrial theory of liability. *See, e.g., Perez–Perez v. Popular Leasing Rental, Inc.,* 993 F.2d 281, 286 (1st Cir. 1993). Looking again to the record, in this case, we conclude that Dr. Naccache has failed to show that Ms. Taylor's expert's testimony was unexpected or that it constituted an alternate theory of liability. From the outset and throughout trial, Ms. Taylor's theory of liability was one of a general failure to treat her properly in light of her test results.

In Ms. Taylor's complaint, she asserted that "Defendant Naccache breached the applicable standard of care by failing to timely and appropriately assess, diagnose and treat Ms. Taylor during her prenatal course, including but not limited to a failure to follow-up on an abnormal urinalysis." Subsequently, in her notice filed pursuant to Rule 26(b)(4), Ms. Taylor stated that one of her experts, Dr. Phillips, was expected to testify that Dr. Naccache failed "to adequately follow-up on relevant diagnostic testing including urinalysis and culture results" and that "[Dr.] Naccache failed to timely institute appropriate antibiotic treatment consistent with the standard of care." And the Joint Pretrial Statement set forth Ms. Taylor's claim against Dr. Naccache as, *inter alia,* "the failure to timely and appropriately treat her urinary tract infection."[21]

20. On appeal, Dr. Naccache argues that, by allowing the testimony, the trial court "committed an error of law," but the case law he cites employs an abuse of discretion standard.

21. Dr. Naccache points to the deposition testimony of Ms. Taylor's expert, Dr. Phillips. We have very little of the transcript of this deposition on appeal. It appears that the

only portions that made it into the trial record were two pages attached to Dr. Naccache's Motion *in Limine.* In these two pages, Dr. Phillips was asked what the appropriate treatment for Ms. Taylor would have been, and he responded that, "the appropriate therapy would be to give her an antibiotic that's consistent with the sensitivity that you get when you do a urine culture and sensitivity." This

Against this backdrop, we disagree that Ms. Taylor presented a "new, previously undisclosed liability theory" at trial. Dr. Phillips testified that a pregnant woman who tested positive for an infection via a urinalysis and a urine culture should be treated with specific antibiotics to eradicate the infection and specifically noted that both tests were important—the urinalysis to show that an infection was present and the urine culture to show what specific bacteria was causing the infection. His additional testimony that a pregnant woman might also require treatment with a broad-spectrum antibiotic was given in direct response to Dr. Naccache's on-the-stand admission (discussed above) that he had not seen the urine culture lab report. Ms. Taylor was entitled to respond to this admission by eliciting testimony from Dr. Phillips that if Dr. Naccache had never seen the lab report, the standard of care required Dr. Naccache to treat Ms. Taylor with a broad-spectrum antibiotic to address the infection reflected by the positive urinalysis. *Cf. Weiner,* 557 A.2d at 1310 (noting that responsive testimony is allowed if it is consistent with the expert's original theory). We are satisfied that this testimony was within the scope of Ms. Taylor's original theory of liability and properly responsive to Dr. Naccache's testimony.

### V.  The *Pannu* Instruction

■  At the close of trial, the court gave the jury the following instruction:

Negligence is a relative concept. A reasonable person changes his conduct according to the circumstances or according to the danger that he knows or should know exists. Therefore, as the danger increases, a reasonable person acts in accordance with those circumstance[s]. Similarly, as the danger increases, a reasonable person acts more carefully.

Counsel for Ms. Taylor had successfully argued that a heightened danger instruction was justified under this court's decision in *Pannu v. Jacobson,* 909 A.2d 178 (D.C.2006), another medical malpractice case, where this court reversed because the jury had not been adequately instructed so as to "account[ ] for each party's legal theory of the case and ... ensure[ ] an accurate and fair statement of the law." *Id.* at 199. The instruction the trial court in this case provided, however, was the instruction the plaintiff in *Pannu* had initially requested at trial; it was not the instruction this court ultimately endorsed. The *Pannu*-approved instruction read: "Negligence is a relative concept. A reasonable doctor under the standard of care conforms his conduct according to the danger he knows, or should know, exists. Therefore, as the danger increases, a reasonable doctor under the standard of care acts in accordance with those circumstances." *Id.* On appeal, Dr. Naccache argues that reversal is required both because the instruction the trial court gave was not the *Pannu*-approved instruction and because there was no factual basis to give a proper *Pannu* instruction in this case.

■■  We assume—without deciding—that that the heightened danger instruction given was legally incorrect and there was no evidentiary basis to give a proper

answer does not suggest that Dr. Phillips opposed antibiotic treatment in response to an abnormal urinalysis where the results of a urine culture had not been obtained or reviewed nor does it support Dr. Naccache's argument that, pretrial, Ms. Taylor's sole the-

ory of the case was that Dr. Naccache had breached the standard of care because he failed to prescribe an antibiotic tailored to the specific bacteria that the lab report would have revealed.

*Pannu* instruction. But to determine if an erroneous jury instruction requires reversal, we must consider its prejudicial impact " 'look[ing] at the instructions as a whole.' " *Campbell–Crane & Assocs., Inc.,* 44 A.3d at 934 (quoting *Chadbourne v. Kappaz,* 779 A.2d 293, 297 (D.C.2001) (internal quotation marks and brackets omitted)). "To find harmless error, we must be 'able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " *Id.* at 935 (internal quotation marks omitted) (quoting *Lacy v. District of Columbia,* 408 A.2d 985, 990 (D.C.1979)). Here, we are hard-pressed to find that Dr. Naccache could have been prejudiced by this single instruction in the context of how the case was presented and the trial court's instructions to the jury as a whole.

To begin with, this instruction was largely unrelated to the case the jury had just heard. Ms. Taylor's central theory of the case was that Dr. Naccache failed to diagnose and treat Ms. Taylor's ASB under a normal standard of care. The entirety of the testimony Ms. Taylor presented at trial reflected a normal standard of care, as did Ms. Taylor's opening and closing. In order to obtain the inclusion of a *Pannu* instruction, Ms. Taylor relied on testimony by Dr. Phillips that Ms. Taylor was part of an at-risk population, but he never testified that Dr. Naccache owed Ms. Taylor a heightened duty of care. Indeed, in closing, Ms. Taylor's attorney mentioned the heightened danger instruction and then immediately undercut it by saying, "Does that mean, ladies and gentlemen, that the standard of care for a high-risk patient or in a high-risk population is any different? No." In addition, when the trial court turned to the specifics of the case in the jury instructions, it summarized Ms. Taylor's theory of the

case by saying that "plaintiff claims defendant was negligent by failing to diagnose and treat her urinary tract infection"; the court said nothing about a heightened standard of care.

Moreover, this heightened danger instruction was not given any prominence. Rather it was four sentences in instructions that, as transcribed, amounted to twenty pages and that focused on a normal, standard of care and made no other allusion to a heightened standard. The trial court informed the jury that it had to determine both what a reasonable physician would have done under similar circumstances in 1987 and whether Dr. Naccache met that standard. The trial court repeatedly referred to a normal standard of care, using phrases like "the degree of care ... customarily exercised by physicians under the same or similar circumstances" and "what a reasonable and prudent professional in his field would have done."

Finally, the jury form, which contained two questions, did not direct the jury to consider a heightened standard of care. The first question asked, "Do you find that Dr. Naccache failed to adequately respond to a urinalysis test and thus breached the standard of care?" In other words, the question asked whether Dr. Naccache had a duty to do something in response to seeing Ms. Taylor's positive urinalysis— not something above and beyond the normal standard of care. The second question asked, "Do you find that Dr. Naccache failed to obtain and adequately respond to Angela Taylor's urine culture result and thus breached the standard of care?" Again, this question does not suggest that Dr. Naccache should have done something above and beyond a normal standard of care. It only asks if Dr. Naccache should have obtained the results of a test that he ordered—an action his own expert testified

fell within the normal standard of care—and should have acted on those results.

Given Ms. Taylor's theory of the case, the instructions as a whole, and the questions posed to the jury on the jury form, we are " 'able to say with fair assurance' " that, even if it was erroneous, the challenged instruction did not " 'substantially sway[ ]' " the judgment in this case. *See Campbell–Crane,* 44 A.3d at 934 (internal quotation marks omitted) (quoting *Lacy,* 408 A.2d at 990).

## VI. The Clear Weight of the Evidence

■ Finally, Dr. Naccache argues that the trial court should have granted his motion for a new trial both because the combination of the individual trial court errors he asserts resulted in a "miscarriage of justice" and because the jury's verdict was against the clear weight of the evidence. We review the trial court's denial of Dr. Naccache's motion for abuse of discretion, *see Fisher v. Best,* 661 A.2d 1095, 1098 (D.C.1995), and find none.

■ A trial court has the power to set it aside a jury verdict and grant a new trial " 'whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice.' " *Lyons v. Barrazotto,* 667 A.2d 314, 328 (D.C.1995) (quoting *Rich v. District of Columbia,* 410 A.2d 528, 534 (D.C.1979)). But having determined that none of the challenges to the trial court proceedings discussed above individually constitutes reversible error, we likewise conclude that in combination they did not give rise to a miscarriage of justice that compelled the trial court to afford Dr. Naccache a new trial.

■ A trial court also has the power to set aside a jury verdict and grant a new trial " 'when the verdict is contrary to the clear weight of the evidence.' " *Id.* at 328 (quoting *Rich,* 410 A.2d at 534). But this power must be carefully exercised so as not to usurp the function of the jury, and motions for a new trial should not be granted when "the evidence consists of conflicting expert opinions, and an impartial trier of fact could reasonably have credited either side's testimony." *Id.* at 329. Such is the case here.

Dr. Naccache asserts that the evidence at trial established that Ms. Taylor's urine culture lab report would have been negative and, in any event, that antibiotics would not have prevented Timothy's premature birth and developmental problems. But he disregards Dr. Phillips testimony to the contrary. Dr. Phillips testified that "[the urine culture lab report] would [have] reveal[ed] that she ... had a bacteria, probably E. coli." He also testified that if Ms. Taylor had been "treated appropriately with antibiotics in a timely fashion, [Timothy's premature birth] would not have occurred" and that "the lack of giving the antibiotics was a proximate and substantial cause in the preterm labor, preterm birth." The jury was entitled to credit this testimony over Dr. Naccache's experts, and we decline to hold that the trial court abused its discretion by failing to second-guess the jury's determination that Dr. Naccache was negligent.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects.

*So ordered.*